887 A.2d 45

**Stanley McCLELLAN**

v.

**DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES.**

**No. 1391, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Sept. 19, 2005.

Reconsideration Denied Dec. 28, 2005.

2

**4**

Darren Margolis of Baltimore, for appellant.

Judith Barr (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before HOLLANDER, DEBORAH S. EYLER, PAUL E. ALPERT (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, J.

In a final administrative proceeding, Stanley McClellan, the appellant, was terminated from his employment as a Correctional Officer II with the Division of Pretrial Detention and Services ("Division"), which is part of the Department of Public Safety and Correctional Services ("Department"). He pursued an action for judicial review in the Circuit Court for Baltimore City. The Department appeared as the respondent. The circuit court affirmed the termination decision.

On appeal, the appellant poses three questions for review, which we have rephrased slightly:

I.  Did the Administrative Law Judge ("ALJ") err in finding that the Department complied with the 30 day time limit for imposing discipline, under Md.Code (1993, 1997 Repl.Vol.), section 11–106(b) of the State Personnel and Pensions Article ("SPP")?

II. Did the ALJ err in finding that the appellant's relationship with a former inmate outside the institution was grounds for discipline?

III. Assuming contact with a former inmate is not a third category infraction, did the ALJ err in upholding the sanction of termination for the remaining second category infractions?

For the following reasons, we shall vacate the judgment of the circuit court and remand the matter for administrative proceedings not inconsistent with this opinion.

## FACTS AND PROCEEDINGS

### Events of November 28–29, 2001

At all relevant times, the appellant was employed by the Division as a Correctional Officer II, at the Baltimore City Detention Center ("BCDC").

The incident central to this case happened when the appellant was off-duty. On November 28, 2001, at about 8:00 p.m., the appellant approached a security guard at Mondawmin Mall in West Baltimore and reported that someone had fired shots at him. He told the security guard he had been driving nearby and stopped at Frederick Douglass High School, across the street from the mall, to urinate. As he was walking back to his car, in the school parking lot, he heard gunshots. He ran across Gwynns Falls Parkway to the mall, and immediately sought help. The appellant did not say anything to the security guard about anyone else.

The security guard called the Baltimore City Police Department ("BCPD"), and officers arrived. The appellant told the officers he had stopped at the high school to urinate and, as he was returning to his car, heard shots. He said he had not seen or spoken to anyone before the shooting, and did not see the shooter.

The investigating officers quickly learned that, at approximately the same time and the same location as the shooting reported by the appellant, a former BCDC inmate named Solothal Thomas had been shot and wounded. For five years, while incarcerated at the BCDC, Thomas had worked on a paint crew that the appellant supervised.

The police officers interviewed Thomas at the scene. Thomas told them the appellant had been present with him at the school parking lot when the shooting happened. According to Thomas, a man wearing a gray "hoodie" approached the two of them and started shooting, striking him (Thomas) in the back.

That same night, as part of their investigation, the BCPD officers performed a gunshot residue test on the appellant's

6

hands. The materials gathered were sent to the BCPD laboratory for analysis.

### Events from November 30, 2001, to March 14, 2002

On December 3, 2001, the BCPD investigating officers contacted the Division's Bureau of Special Operations ("Bureau") about their November 28 encounter with the appellant. The Bureau includes the Internal Investigations Unit ("IIU"). At the relevant time, Major Melvin Richardson was the commander of the Bureau.

Also on December 3, 2001, the appellant submitted a "Matter of Record" ("MOR") to the Division, setting forth his version of the November 28 incident. He said he had been walking back to his car when he heard gunshots and "the clicking sound of a gun." He ran toward the mall; as he did so, he turned and saw an "unknown Black male, wearing a short red jacket," running across the school parking lot "near [his] car." He further recounted reporting the shooting to a mall security guard; being taken to the school parking lot; being transported to the Central District station house, where his hands were tested for gunshot residue; and then being transported to the Western District station house, where he was interrogated by BCPD Detective Russell Robar and his partner (whose name does not appear in the record). The appellant stated that, during the interrogation, Detective Robar's partner said he "did not like Jail Guards" and that one correctional officer already had lost his job "over the victim Thomas." The appellant asked the officers whether they were talking about Solothal Thomas, and what that had to do with him; and told them, "No one was with me at the time, someone was shooting at me. I did not see Solothal Thomas or anyone else I knew during the time of the shooting."

The next day, December 4, the appellant submitted a second MOR, stating that he had noticed a red car following him on December 1, and that its occupants were looking at him; that he had seen the red car on the day of the shooting; and that

he had given that information to a "Detective Robinson" of the BCPD and she had promised to investigate.[1]

Also on December 4, Detective Robar wrote a memorandum to his superior officer, Lieutenant Deborah Owens, about his interrogation of the appellant on November 28. He commented that the appellant was not cooperative during the interview and his version of events was inconsistent with Thomas's version of events and with evidence found at the scene of the shooting. (He did not specify what evidence he was referring to.) Detective Robar also noted that the appellant and Thomas were "previous friends and [had] known each other for several years." He stated that an attempt would be made to schedule another interview with the appellant to gather additional information.

And also on December 4, 2001, Major Richardson submitted a memorandum to Lamont Flanagan, Commissioner of the Division, informing him that the appellant had been questioned by the BCPD about a November 28 shooting in West Baltimore involving former inmate Thomas; and that "a case [was] being developed to ascertain [the appellant's] involvement[.]" Major Richardson further stated in the memorandum that Thomas had worked under the appellant's supervision at the BCDC and the appellant had admitted to knowing Thomas outside of that setting. He concluded by noting, "Case assessment is to be provided by BCPD after their reinterview of [the appellant] on 12–4–01."

Sometime in December 2001, on a date not disclosed in the record, Major Richardson and Captain Frank Day, another employee with the Bureau, questioned the appellant about the November 28 incident and his relationship with Thomas. Bureau staff also questioned Thomas at a date "close to the time that the incident occurred."

---

1. The appellant also noted that he had contacted "Internal Investigations" about filing a complaint against one of the detectives who had interrogated him, but had yet to hear anything in response.

On December 20, 2001, Detective Robar's December 4 memorandum was received by the Division, and was signed by Major Richardson.

### Events from March 15, 2002, to June 26, 2002

Nothing further happened until March 15, 2002. That day, the BCPD issued a Gunshot Primer Residue Report ("the Report") documenting the results of the test performed on the appellant's hands. The Report showed that gunshot residue was found on the appellant's left hand and stated that the most likely explanation for that was that the appellant's hands had been "immediately adjacent to a discharging firearm or were themselves used to fire the firearm within a few hours" of the time the test was taken on November 28, 2001.

The Division received the Report on April 10, 2002. Deputy Commissioner Benjamin Brown learned of the Report that same day.

On April 11, 2002, the appellant was asked to submit another MOR to explain the gunshot residue test results. The appellant did so. In an MOR that same day, the appellant said:

I know that a mistake or error was made on the Report. Reason Being; at the time of the incident I had not handled or touch[ed] any firearms since the last time I went to the range at work! And that was more than a few hours, that was months. I did not shoot any person or [see] anyone get shot on the date of November 28, 2001 or any other date.

The next day, April 12, 2002, Major Richardson submitted to Commissioner Flanagan a written investigative report about the November 28 incident, the appellant's MORs, and the Report. Major Richardson noted that the results of the gunshot residue test "were in direct opposition to the statements provided by [the appellant] of his involvement and or knowledge of the November incident." He concluded that the appellant had violated several Department Standards of Conduct and provisions of the Code of Maryland Regulations ("COMAR").

On April 25, 2002, Deputy Commissioner Brown signed the appellant's Notice of Termination, as his "appointing authority." As pertinent to the case, the Notice of Termination advised the appellant that he was being terminated for violating provisions of COMAR 17.04.05.04B prohibiting conduct that would bring the State into disrepute; involving dishonesty, fraud, deceit, misrepresentation, or illegality; willfully making a false report; knowingly assisting another in unlawful conduct; insubordination; and committing an act, other than those already specified, detrimental to the State.[2]

The Notice of Termination further advised the appellant that he had violated provisions of the Department Standards of Conduct prohibiting conduct unbecoming an employee of the Department; failure to perform duties in a manner consistent with Standards; making a false or an inaccurate report; committing second category infractions by making a false report and by insubordination; and committing a third category infraction by engaging in an "[u]nprofessional personal relationship or contacts with [an] inmate, offender or client."[3]

Under "Explanation For Termination," the Notice stated:

---

2. The provisions of COMAR 17.04.05.04B that the appellant was charged with violating are:
    B. An employee may be disciplined for engaging in any of the following actions:
    (3) Being guilty of conduct that has brought or, if publicized, would bring the State into disrepute;
    (8) Engaging in conduct involving dishonesty, fraud, deceit, misrepresentation, or illegality;
    (10) Wilfully making a false official statement or report;
    (11) Knowingly assisting another in conduct in violation of State Personnel and Pensions Article, Annotated Code of Maryland, the regulations in this chapter, or any other lawful agency policy;
    (12) Violating a lawful order or failing to obey a lawful order given by a superior, or engaging in conduct, violating a lawful order, or failing to obey a lawful order which amounts to insubordination;
    (15) Committing another act, not previously specified, when there is a connection between the employee's activities and an identifiable detriment to the State.

3. The Standards of Conduct that the appellant was charged with violating are:
    II.B. Personal Conduct

On December 3, 2001, the Bureau of Special Operations of the Department of Pretrial Detention and Services [r]eceived information that Correctional Officer II Mr. Stanley McClellan had been questioned by the Baltimore City Police Department in reference to a shooting incident that occurred in West Baltimore on November 28, 2001. According to the police, the victim in the shooting was a former inmate, Solothal Thomas. At the time of the shooting, Officer McClellan claimed that he had stopped his vehicle at Douglas[s] High School to urinate. While he was so engaged, he claimed he heard gunshots, and the gunshots

---

1. Each employee shall conduct him/herself at all times, both on and off duty, in such a manner as to reflect most favorably on the Department. Any breach of the peace, neglect of duty, misconduct or any conduct on the part of any employee of the Department, either within or outside of his/her place of employment, which tends to undermine the good order, efficiency, or discipline of the Department, or which reflects discredit upon the Department or any employee thereof, or which is prejudicial to the efficiency and discipline of the Department, even though these offenses may not be specifically enumerated or stated, shall be considered conduct unbecoming an employee of the Agency, and subject the employee to disciplinary action by the Agency....

II.J. Performance of Duties

An employee of the Department shall be responsible for his/her own actions, as well as the proper performance of his/her duties. In carrying out the functions and objectives of the Department, an employee shall perform his/her duties in a manner that will maintain the highest standards of efficiency....

II.S. Reports

1. An employee may not make any false oral or written statement or misrepresent any material fact, under any circumstance, with the intent to mislead any person or tribunal. Reports submitted by employees shall be clear, concise, factual and accurate. There is a distinction between the two kinds of reports:

a. A false report is one which is intentionally untrue, deceptive or made with the intent to deceive the person to whom it is directed.

b. An inaccurate report is one that is untrue by mistake or accident and made in good faith....

IV.E.

2(a) Second Category Infractions

(9) Insubordination.

(14) Filing of a false report.

3(a) Third Category Infractions

(10) Unprofessional personal relationship or contacts with inmate, offender or client.

were directed at him. Officer McClellan stated to police that he then ran across the street to Mondawmin Mall and contacted security to report the shooting. When the police arrived, Officer McClellan was uncooperative and evasive about the circumstances surrounding the shooting.

Based on his lack of cooperation and the statements of former inmate Solothal Thomas'[s] statement that Officer McClellan was there to meet him, the police requested that a gunshot residue test be conducted on Officer McClellan. During the shooting, former inmate Solothal Thomas was shot and wounded. On April 11, 2002, Officer McClellan was questioned again concerning the incident and denied any involvement. However, the gunshot residue test conducted by the Baltimore City Police Department proved positive for gunshot residue on Officer McClellan's left hand. Clearly the positive gunshot residue test results revealed that Officer McClellan was less than truthful about the incident. Moreover, Officer McClellan knew former inmate [Thomas] from the paint crew at the institution. Office[r] McClellan's failure to provide an accurate account of the shooting incident, his inappropriate relationship with a former inmate and his failure to cooperate with police during the investigation make him an unacceptable candidate for continued employment as a correctional officer.

Officer McClellan has failed to offer any facts to establish how the gunshot residue came to be on his hand. Honesty and integrity are essential characteristics for correctional officers. Mr. McClellan has failed to demonstrate either. Therefore, the proposal to terminate his employment is the most prudent course of action.

The Notice of Termination was approved by Stuart Simms, who was then Secretary of the Department, on April 30.

On May 8, the appellant appealed his termination to Secretary Simms. The appeal was denied on May 24. The appeal then was forwarded to the Office of Administrative Hearings on June 26, 2002, pursuant to SPP section 11–110. An ALJ was assigned to handle the matter.

## Motion Proceedings Before the ALJ

On October 4, 2002, the appellant filed a "motion to dismiss" the termination, alleging that it was untimely under SPP section 11–106(b), which states, in relevant part, that "an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed."

An evidentiary hearing on the motion was held on April 25, 2003. The appellant testified that he immediately informed his shift commander about the November 28 incident; that he was instructed to write a report about what had happened, which he did; and that he was interviewed by Major Richardson "a couple days" after the incident.

The Division called Deputy Commissioner Brown and Major Richardson as witnesses.

Deputy Commissioner Brown testified that it was "normal" for the Bureau to conduct investigations of employee misconduct and that Major Richardson "works for" Commissioner Flanagan. Deputy Commissioner Brown learned of the November 28 incident on December 4, when he read Major Richardson's memorandum to Commissioner Flanagan. In his view, there was "nothing in that report to indicate a need to consider" taking action against the appellant. The MORs and Major Richardson's December 4 memorandum were not part of an "ongoing investigation." Rather, they were "normal and routine communications." An investigation was not conducted until April 10, when the Division received the Gunshot Residue Test Report. The bases for the appellant's termination were "the charges that came out of the investigation, all of which were sustained during the investigation, specifically that investigation started from the report by the police of the positive test for gunshot residue."

Deputy Commissioner Brown never saw the December 4 memorandum from Detective Robar to Lieutenant Owens. He acknowledged that the presence of Major Richardson's signature on that document showed that Major Richardson

received it on December 20. There was no Departmental requirement for the IIU to conduct its own investigation when the BCPD was investigating an employee, absent a "formal allegation" by the BCPD. According to Deputy Commissioner Brown, Detective Robar's December 4 memorandum was not "prima facie evidence of alleged false statements given to a law enforcement official" and thus Major Richardson was not required to conduct any investigation upon receiving it.

Major Richardson testified that an "investigation" by the Bureau started upon receipt of information from the BCPD about the shooting. He acknowledged that, if a law enforcement agency reported to the Bureau that a Division employee was "impeding the process of an investigation," the Bureau would "approach that employee, ask for some clarification, and as to conducting an investigation or interrogation or whatever you want to call it with that employee, it would be done."

According to Major Richardson, sometime in December 2001, the Bureau staff, including Captain Day, questioned the appellant and Thomas. He (Richardson) questioned the appellant "in reference to the clarity of the reports." This questioning was an "internal" investigation. Also as part of the investigation "stemming from the [December 4 memorandum by Detective Robar,]" Major Richardson questioned the appellant and Thomas about "issues of fraternization."

In deciding what action to take, Major Richardson gave "equal weight" to the appellant's statements and Detective Robar's December 4 memorandum. He had "no reason to believe that [the appellant's] involvement" in the shooting incident "was anything but what he had indicated to us"; therefore, he accepted the appellant's portrayal of himself as a victim in the events of November 28. At that point, according to Major Richardson, "we could proceed no further" and no action was taken. He did not inform his "appointing authority" about the investigation because there "was nothing to tell. Unless it could be substantiated, there was nothing that we felt we needed to tell the appointing authority about at that time." "The investigation as far as information gathering,

continuing to interview [the appellant], came to an end in November or December[.]"

Major Richardson testified that everything changed when the Bureau received the gunshot residue test report: that made "the difference ... in the entire investigation." He acknowledged knowing in December that the BCPD had gathered the material from the appellant for testing on November 28, and that it would take "some time" for the test results to come back. The investigation "took on a different phase, if you want to call it that, once the information about the gunshot residue came in." At that point, Major Richardson notified the "appointing authority" of the results of the gunshot residue test.

The appellant's lawyer argued in closing that the triggering date for the Division to take disciplinary action under SPP section 11–106(b) was at the latest December 20, 2001, when Major Richardson received Detective Robar's December 4 memorandum. Counsel for the Division responded that the triggering date was April 10, 2002, when Deputy Commissioner Brown received the Gunshot Residue Test Report.

The ALJ took the case under advisement. On June 5, 2003, he issued a written decision finding that the Division had complied with the 30 day time period established by SPP section 11–106(b). We shall discuss the basis for that decision later in this opinion.

### Merits Proceedings Before ALJ

An evidentiary hearing on the merits of the appellant's termination from employment was held on November 26, 2003. The Division called as witnesses Joseph Harant, a criminalist with the BCPD, and Major Richardson.

Harant was qualified as an expert in trace analysis and gunshot residue testing. He testified that the gunshot residue test on the appellant's hands revealed residue on his left hand, but not on his right hand, even though the appellant is right-handed, and opined that those findings could be explained on several bases: residue particles could have fallen off the

appellant's right hand; he could have been wearing a glove on his right hand; or he could have been in close proximity to the weapon (within three feet of it) when it was fired.

Major Richardson testified that the appellant was terminated because he did not give a truthful statement about the November 28 incident, and that, in the view of the administration, this was not acceptable behavior for a correctional officer. The appellant's length of service, his overall performance, and his clean disciplinary record were taken into account when, at the time of the November 28 incident, management made the decision to believe the appellant's statements and not to take any action.

The appellant testified on his own behalf. He gave his account of the events leading up to his termination. He denied having a relationship that was "other than professional" with Thomas. He acknowledged having seen Thomas several times subsequent to Thomas's release from the BCDC. He denied having handled a gun on November 28, 2001. He attempted to explain the gunshot residue test results by saying that he must have picked up residue "when [he] went into the door into the garage" at the police station.

The appellant also called three witnesses: Michele Edwards, a co-worker, who testified that the appellant had told her about being questioned by the police on December 3; Stacey Lyles, the appellant's supervisor, who testified that the appellant was a "good officer"; and Kenneth Bartee, another co-worker, who testified that he had no reason to question the appellant's integrity as it related to dealing with inmates.

The Division's lawyer argued in closing that the appellant violated the provisions of the Standards of Conduct and CO-MAR by giving false reports, "particularly the report of April 11th, 2002." He also argued that the appellant had violated the provisions of the Standards of Conduct dealing with fraternization because Thomas was an "offender."

Counsel for the appellant responded that several employees had testified that he was a good officer, and that Harant had not testified that he had fired a weapon, only that a weapon had been fired near him.

The ALJ took the case under advisement.

On January 9, 2004, the ALJ issued a written decision affirming the appellant's termination by the Department. He made the following first level factual findings.

The appellant intentionally met with Thomas on the parking lot of Frederick Douglass High School on the night of November 28, 2001. During that meeting, shots were fired and Thomas suffered a gunshot wound. The appellant ran across the street to the mall and reported that shots had been fired at him, without making reference to Thomas. When the police came, the appellant gave them the same story, without any reference to Thomas, and saying that he did not see the shooter.

In his MORs of December 3 and 4, 2001, the appellant denied seeing or speaking to Thomas on the night of November 28, firing a weapon that night, or knowing anything about the shooting of Thomas. In fact, based on the gunshot residue test results obtained by the Division on April 10, 2002, the appellant either fired a gun that night, or was within three feet of someone who fired a gun. The appellant's April 11, 2002 MOR failed to account for the presence of gunshot residue on his left hand on November 28; and in that MOR, he said he had not fired a weapon that day, or within several months prior. The appellant received a Notice of Termination based on his alleged failure to provide an accurate account of the shooting incident, his inappropriate relationship with a former inmate, and his failure to cooperate with the police during the investigation of the shooting incident.

On those findings, and based on a negative demeanor-based credibility assessment of the appellant, the ALJ concluded that the Department proved, by a preponderance of the evidence, that the appellant violated COMAR sections 17.04.05.04B(3), (8), (10), (11), (12), and (15); and Standards of Conduct II.B(1), (J), (S), IV.E.2.(a)(14), and IV.E.3.(a)(10).[4]

---

4. The Notice of Termination also had advised the appellant that he had violated SPP section 11–105(1)(i), which provides that "intentional

The ALJ determined that, "even without the gunshot residue evidence," the evidence supported findings that the appellant "failed to provide an accurate account of the shooting incident . . .; that he did not cooperate fully with the police investigation [of] the matter; and that he maintained an inappropriate relationship with a former inmate[.]"

The ALJ rejected the appellant's arguments that the gunshot residue test results were contaminated, or that chain of custody had not been proven, and, crediting Harant's testimony, concluded that the test results showed that the appellant "was not forthcoming as to his involvement in the incident."

### *Circuit Court Judicial Review*

On February 6, 2004, the appellant filed an action for judicial review in the circuit court, challenging the ALJ's decision. Both parties filed legal memoranda. On August 2, 2004, the court issued a memorandum opinion and order affirming the ALJ's decision.

The appellant noted a timely appeal.

## DISCUSSION

### *Standard of Review*

When reviewing a decision of an administrative agency, our role is "precisely the same as that of the circuit court." *B & S Marketing Enterprises, LLC v. Consumer Protection Div.*, 153 Md.App. 130, 150, 835 A.2d 215 (2003) (quoting *Dep't Of Health and Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994)). We review only the decision of the administrative agency itself. *Maryland*

---

conduct, without justification, that seriously injures another person" is a cause for automatic termination of employment. The ALJ concluded that the Department did not meet its burden of showing a violation of that statute. The ALJ found that the "circumstances of the discharge of a firearm during the incident remain sufficiently murky as to preclude a finding that the Appellant in fact shot Thomas."

Also, the ALJ made no mention or finding in his written decision about the insubordination charge (violation of Standard of Conduct IV.E.2(a)(9)).

*Dep't. of Public Safety & Correctional Services v. PHP Healthcare Corp.*, 151 Md.App. 182, 194, 824 A.2d 986 (2003).

Our review is a two-fold inquiry: we determine whether there is substantial evidence in the record to support the agency's findings and conclusions and whether the agency's decision is premised upon an erroneous conclusion of law. *Motor Vehicle Administration v. Lytle*, 374 Md. 37, 56, 821 A.2d 62 (2003); *Kram v. Maryland Military Dep't.*, 146 Md.App. 407, 411–12, 807 A.2d 120 (2002). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sadler v. Dimensions Healthcare Corp.*, 378 Md. 509, 529–30, 836 A.2d 655 (2003); *Jordan Towing, Inc. v. Hebbville Auto Repair, Inc.*, 369 Md. 439, 451, 800 A.2d 768 (2002). Substantial evidence review is narrow; the question is not whether we would have reached the same conclusions, but merely whether "a reasoning mind" could have reached those conclusions on the record before the agency. *Stansbury v. Jones*, 372 Md. 172, 182–83, 812 A.2d 312 (2002).

We appraise an agency's fact finding in the light most favorable to the agency, and this deference extends to subsequent inferences drawn from that fact finding, so long as supported by the record. *Schwartz v. Maryland Dep't. Of Natural Resources*, 385 Md. 534, 554, 870 A.2d 168 (2005). We give great deference to the agency's assessment of the credibility of the witnesses. *Gigeous v. Eastern Correctional Institution*, 363 Md. 481, 504, 769 A.2d 912 (2001); *Finucan v. Maryland State Bd. of Physician Quality Assurance*, 151 Md.App. 399, 421, 827 A.2d 176 (2003).

When an issue is a pure question of law, a reviewing court may always substitute its judgment for that of the administrative agency. *Spencer v. Maryland State Bd. of Pharmacy*, 380 Md. 515, 528, 846 A.2d 341 (2004); *Ocean City Police Dep't v. Marshall*, 158 Md.App. 115, 122, 854 A.2d 299 (2004).

# I.

The appellant contends the ALJ erred in denying his motion to dismiss the disciplinary action for failure to comply with the 30–day time limit for imposing discipline under SPP section 11–106(b).

## (a)

SPP section 11–106 provides:

(a) *Procedure*—Before taking any disciplinary action related to employee misconduct, an appointing authority shall:

(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

(b) *Time limit*—Except as provided in subsection (c) of this section, *an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.*

(c) *Suspension*—(1) An appointing authority may suspend an employee without pay no later than 5 workdays following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed.

(2) Saturdays, Sundays, legal holidays, and employee leave days are excluded in calculating the 5–workday period under this subsection.

(Emphasis added.)

Pursuant to SPP section 1–101(b), the "appointing authority" is "an individual or a unit of government that has the power to make appointments and terminate employment."

In *Western Correctional Institution v. Geiger,* 371 Md. 125, 144, 807 A.2d 32 (2002), the Court of Appeals held that an appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed, within the meaning of SPP section 11–106(b), when the appointing authority has "knowledge sufficient to order an investigation" into the alleged misconduct.

In the Court of Appeals, *Geiger* was a consolidated review of three cases, from three different counties, in which correctional employees were disciplined more than 30 days after their appointing authorities learned of an allegation of misconduct. In an action for judicial review in one case (employee Pflaumer), the circuit court affirmed the disciplinary action. It reasoned that SPP section 11–106(b) could not be construed as requiring that discipline be imposed within 30 days of acquiring knowledge sufficient to initiate an investigation, because, if that were the case, and an appointing authority discovered the "most credible evidence of misconduct" on the 31st day, disciplinary action could not be taken. The circuit court concluded that that would lead to "absurd results." *Id.* at 136, 807 A.2d 32.

In separate appeals, this Court affirmed the disciplinary actions. Our opinions in the Pflaumer case and the case involving employee Mullen were unreported. In a published opinion regarding employee Geiger, we recognized an exception to the 30–day time limit, permitting the appointing authority to show that its investigation "was conducted with reasonable diligence" and that the disciplinary action "was imposed no later than 30 days after the required investigation had been completed." *Western Correctional Institution v. Geiger,* 130 Md.App. 562, 569–70, 747 A.2d 697 (2000).

The Court of Appeals granted a writ of *certiorari.* Before that Court, the agency argued that the 30–day period under SPP section 11–106(b) does not commence until the appointing authority is informed of the results of an investigation substantiating the allegations of misconduct.

The Court of Appeals, finding the language of SPP section 11–106 unambiguous, and looking also to the supporting legislative history, held that the General Assembly intended to create, and did create, a bright-line rule making uniform what must be done by the agency before taking disciplinary action related to employee misconduct and when disciplinary action must be taken. 371 Md. at 144–45, 807 A.2d 32. Rejecting the agency's argument and the analyses of the circuit court and this Court, the Court of Appeals explained:

> *Knowledge sufficient to order an investigation is knowledge of the misconduct for which discipline was imposed, if discipline ultimately is imposed for that misconduct.* It is not at that stage in the process, to be sure, proof as to who is the responsible person and may not even be knowledge as to who that person is. Section 11–106, however, is not person specific; it is situation and fact based. Thus, the knowledge that triggers the running of the thirty day period need not, and may not, although it generally will, identify the employee ultimately disciplined.
>
> We hold that, viewed in context, § 11–106 gives the appointing authority 30 days to conduct an investigation, meet with the employee the investigation identifies as culpable, consider any mitigating circumstances, determine the appropriate action and give notice to the employee of the disciplinary action taken.

*Id.* (emphasis added).

The Court concluded that rescission of the discipline imposed was the appropriate sanction for noncompliance with the 30–day mandatory time requirement. *Id.* at 151, 807 A.2d 32.

Recently, in *White v. Workers' Compensation Commission,* 161 Md.App. 483, 491, 870 A.2d 1241 (2005), this Court applied the *Geiger* holding to a suspension under SPP section 11–106(c)(1), which allows an appointing authority to suspend an employee without pay "no later than 5 work days following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed." We held that "knowledge of the misconduct

for which the suspension is imposed" means knowledge sufficient to order an investigation. *Id.*

## (b)

In his written decision denying the appellant's motion to dismiss, under SPP section 11–106(b), the ALJ recited a chronology of facts and made findings. He found, based on the evidence that Major Richardson received Detective Robar's December 4 memorandum on December 20, that "beginning on December 20 ... the Agency knew that there had been an unusual incident involving gunfire, which, at the least, occurred in the vicinity of the Appellant"; that the incident "apparently involved a former inmate ... [Thomas], who was well-known to the Appellant"; and that the investigating officers with the BCPD had found the appellant uncooperative and were of the view that his statements and the physical evidence were inconsistent. "The Agency" also knew that the appellant claimed not to have seen Thomas on the night of November 28, not to have known anything about Thomas's having been shot, and to have been a victim of an unknown assailant. Major Richardson credited the appellant's version of the events of November 28, until April 10, when the gunshot residue test results were received, and "the Agency launch[ed] a formal investigation[.]"

The ALJ further found that the knowledge of misconduct that "the Agency" had beginning on December 20, 2001, was not knowledge of the misconduct for which the appellant was terminated, on April 30. The ALJ explained:

[T]he misconduct for which the Appellant was terminated was not that he was present at or around a shooting, or even that he had some type of relationship with Thomas. The Notice of Termination is predicated on narrow grounds, i.e., that he lied about his involvement in the incident of November 28, 2001 in that nothing in his various statements is able to account for the presence of gunshot primer residue on his hand. No investigation by the Agency, even if conducted immediately upon becoming aware of the incident, could have determined that the Appellant had gunshot

primer residue on his hand and therefore must have lied about his role in the incident. That information could have come only from the [BCPD].

The ALJ discussed *Geiger* and observed that the holding does not preclude an appointing authority from taking disciplinary action against an employee upon receiving "new, previously unavailable information" concerning the employee's misconduct. The ALJ further distinguished *Geiger* from this case on the ground that the alleged misconduct did not occur in the workplace and "the authority and ability to conduct a full investigation of the events in question resided with a different governmental entity[,]" that is, the BCPD.

The ALJ determined that Deputy Commissioner Brown acted as the appellant's appointing authority. Finally, the ALJ found that, within the meaning of SPP section 11–106(b), the appointing authority did not acquire knowledge of the wrongdoing for which the appellant was terminated until April 10, 2002. Accordingly, the termination, within 30 days of that date, was timely.

### (c)

■ Under SPP section 11–106(b), as interpreted by the Court of Appeals in *Geiger*, our task on appeal is to determine whether there is substantial evidence in the record to support the ALJ's finding that the appellant's "appointing authority" did not acquire knowledge of the misconduct for which discipline was imposed more than 30 days before the date that the disciplinary action was taken (April 30, 2002).

Section 5–202(c)(4), of the Correctional Services Article ("CS") of the Maryland Code (1999), designates the Commissioner of the Division as the appointing authority for all Division employees. The BCDC is a part of the Division, CS sections 5–201(b)(2) and 5–401(a), and the appellant, as an employee at the BCDC, was an employee of the Division. Accordingly, by statute, Commissioner Flanagan was the appellant's appointing authority. Evidence in the record supports the ALJ's factual finding that Deputy Commissioner

Brown was acting as the appellant's appointing authority, apparently upon delegation by Commissioner Flanagan, in signing the appellant's Notice of Termination.

An appointing authority may acquire knowledge of misconduct of an employee directly, *i.e.*, personally, or indirectly, through imputation of the knowledge of an agent. We recognized this principle in *Ford v. Dep't of Public Safety and Correctional Services*, 149 Md.App. 488, 817 A.2d 264 (2003). In that case, we held that knowledge of an investigator with the Internal Investigative Unit of the Department could not be imputed to the warden of the Eastern Correctional Institute, who was the employee's appointing authority, because the investigator "did not answer to the warden . . . and had no duty to report his knowledge to the warden." *Id.* at 499, 817 A.2d 264. "Since [the investigator] had no duty to report [the allegations of misconduct made against the employee] to the appointing authority, [the investigator's knowledge] cannot be imputed to [the appointing authority] under principles of agency." *Id.*

In the case at bar, the evidence adduced at the motion hearing was uncontroverted that the Bureau was a part of the Division; that one of the Bureau's functions was to conduct investigations of employee misconduct; and that Major Richardson, who was in charge of the Bureau's investigations, including those by IIU, "work[ed] for" Commissioner Flanagan. This evidence established, and it was not contested, that Major Richardson and the Bureau employees who were working directly for him on the matter of the appellant's conduct were acting as agents of Commissioner Flanagan at all relevant times in this case. Accordingly, we hold that the evidence established that the knowledge acquired by Major Richardson and these particular Bureau agents was imputed to Commissioner Flanagan, who was the appellant's appointing authority.

To answer the question when the appointing authority acquired knowledge of the misconduct for which discipline was imposed, it is necessary to determine the misconduct for which

discipline was imposed. The disciplinary action in this case was termination. The ALJ expressly found that the appellant *was not* terminated by the Department for misconduct based on his presence at or around the shooting or for his having "some type of relationship" with Thomas. He further found that the termination was predicated on "narrow grounds, *i.e.,* that [the appellant] lied about his involvement in the incident of November 28, 2001, in that nothing in his various statements is able to account for the presence of gunshot primer residue on his hand." Implicitly, the ALJ found that the appellant was terminated for giving a false statement on April 11, 2002, but not for giving false statements in his MORs of December 3 and 4, 2001, for giving false statements to the BCPD investigating officers, or for not cooperating in the police investigation of the shooting incident.

These findings are not supported by substantial evidence in the record. The language of the Notice of Termination and the charges brought against the appellant show that the appellant was terminated for misconduct that occurred in November and December 2001 *and* for misconduct that occurred in April 2002—not just for the latter.

The "Explanation for Termination" in the Notice of Termination alleges that the appellant failed to provide an accurate account of the shooting incident, without specifying a time frame (which would cover November and December 2001 and April 2002 misconduct); that the appellant engaged in an inappropriate relationship with a former inmate (November and December 2001 misconduct); that he failed to cooperate in the police investigation of the shooting (also November and December 2001 misconduct); and that these actions "make him an unacceptable candidate for continued employment as a correctional officer." The explanation further states that the appellant failed to offer any facts to show how the gunshot residue came to be on his hand (April 2002 misconduct), equating that to dishonesty and lack of integrity, and making the proposal to terminate his employment "the most prudent course." The Explanation of Termination thus is not limited to misconduct in April 2002.

Also, the charges in the Notice of Termination are not by their nature limited to misconduct occurring in April 2002. The charges of having an unprofessional personal relationship with an inmate, offender, or client and of knowingly assisting another in unlawful conduct clearly pertain to events that took place in November and December of 2001. The other charges all could pertain to events in November and December 2001 and in April 2002. For example, the charges of making a false report could pertain to the appellant's report to the BCPD investigating officers, his MORs of December 3 and 4, 2001, and/or his MOR of April 11, 2002. Indeed, there are no charges that focus solely on events that occurred in April 2002.

The ALJ's finding that the appellant was terminated by the Department for misconduct that took place in April 2002, and not before, was clearly wrong. We note, also, that the finding later was contradicted by the ALJ's determination, in the merits hearing decision, that the appellant properly was terminated by the Department for, among other reasons, having an inappropriate relationship with Thomas; and that "even without the gunshot residue evidence ... the Agency's claims that the Appellant failed to provide an accurate account of the shooting incident ... that he did not cooperate fully with the police investigation into the matter; and that he maintained an inappropriate relationship with a former inmate are fully supported by the evidence." The ALJ's ultimate conclusion, on the merits, that the appellant was properly terminated for every violation alleged against him (except for the SPP section 11–105(1)(i) allegation and insubordination, as noted above) is at odds with his prior determination, on the motion to dismiss, that the sole basis for the appellant's termination was his misconduct in April 2002.

The uncontroverted evidence adduced at the motion hearing established that the termination action was taken against the appellant based on misconduct in November and December 2001, and in April 2002. The misconduct in November and December 2001 included his actions in being involved in the shooting incident on November 28, 2001; in making false statements to the BCPD; in not cooperating with the BCPD

investigation of the shooting incident; in making false statements in his MORs of December 3 and 4, 2001; and in engaging in unprofessional contact with Thomas. The misconduct in April 2002 consisted of his making a false statement in his MOR of April 11.

The ALJ found that on December 20, 2001, "the Agency" was in receipt of Detective Robar's December 4 memorandum. That memorandum conveyed, among other things:

- that the appellant was a witness to a shooting on November 28, 2001
- that in an initial interview, the appellant said he had not seen or spoken to anyone, and that he only heard shots and then ran
- that the appellant refused to give the investigating officers any information about the shooting
- that the shooting victim was Thomas
- that Thomas's version of the shooting incident and the appellant's version were factually inconsistent
- that Thomas's version had a third person firing shots in the appellant's presence
- that the information the appellant gave in the initial interview and the evidence recovered at the crime scene did not "relate"

The ALJ determined from this evidence that "the Agency" knew, by December 20, 2001, that the appellant had been involved in an "unusual incident involving gunfire" that "apparently involved a former inmate . . . who was well-known to" him, and that an investigating BCPD officer had found the appellant to be uncooperative and his statements inconsistent with the physical evidence. The ALJ further determined that the staff members of the Bureau who were looking into the incident were in possession of the appellant's MORs, in which he stated that he was being investigated by the BCPD and that materials had been gathered from him that were to be tested for gunshot residue. These findings were supported by substantial evidence in the record.

Two pieces of evidence that were uncontradicted, but not mentioned by the ALJ in his chronology of events, also were important to the issue of knowledge of misconduct. In his December 4, 2001 memorandum, Major Richardson informed Commissioner Flanagan (the appointing authority) that the appellant had been questioned by the BCPD with regard to a shooting involving former inmate Thomas; that "a case [was] being developed [by the BCPD] to ascertain [the appellant's] involvement in this incident"; that the appellant supervised Thomas at the BCDC and admitted knowing him outside the facility; and "[c]ase assessment is to be provided by BCPD after their reinterview" of the appellant. Also, Major Richardson testified that the Bureau conducted an investigation in December 2001, in response to the information imparted by the BCPD, and that the investigation included questioning the appellant about issues of "fraternization" with Thomas.

The Department argues, as it did before the ALJ, that the appointing authority did not acquire, in December 2001, knowledge of the misconduct for which the appellant was disciplined, for two reasons. First, the Bureau assessed the information it obtained in December 2001, determined that there was evidence for and against misconduct by the appellant, and chose to believe the appellant's version of events, in part because he was a trustworthy employee with no past disciplinary history. Citing *Ford, supra,* it argues that it was entitled to accept the appellant's version of events until there was some other corroborating evidence to negate it. Second, and relatedly, it was only upon receipt of the Report showing the gunshot residue test results, in April 2002, that the appointing authority *could* acquire knowledge that the appellant's version of events was not truthful.

In his decision on the motion, the ALJ appears to have credited these arguments, noting that "[o]nly after the residue report was received on April 10, 2002, did the Agency launch a formal investigation, culminating in Major Richardson's report of April 12, 2002 ... conclud[ing] that the Appellant was untruthful in his accounts of the incident and therefore had violated various provisions of the Standards of Conduct." The

ALJ described the gunshot residue test results as "new, previously unavailable information concerning the employee's wrong doing."

The Department's arguments, and the ALJ's findings based on them, contradict the Court of Appeals holding in *Geiger*, and are not supported by our holding in *Ford*. The essence of the argument advanced by the agency in *Geiger* was that an appointing authority does not acquire knowledge of misconduct until it obtains the results of an investigation into the misconduct. The Court rejected that argument, as we have explained, holding that knowledge sufficient to order an investigation—not knowledge obtained by completion of an investigation—triggers the 30-day time period. The Court characterized knowledge sufficient to order an investigation as "knowledge of an allegation that the employee had engaged in misconduct or of a situation that could have resulted in that employee's being disciplined." 371 Md. at 131, 807 A.2d 32. The Court also pointed out that "an investigation, of necessity, is of 'alleged misconduct' " —not of misconduct already proven. *Id.* at 145 n. 15, 807 A.2d 32.

In the case at bar, the evidence introduced at the motion hearing established that in December 2001 the appellant's appointing authority (Commissioner Flanagan, through his agent, Major Richardson and the Bureau staff working under Major Richardson) had sufficient knowledge to order an investigation about the appellant's involvement in the shooting incident, his relationship with Thomas, his cooperation or lack thereof with the BCPD officers investigating the shooting, and the truth or falsity of his statement to the BCPD and his MOR statements of December 3 and 4.

The appointing authority had knowledge of all those allegations of misconduct, and that the appellant was denying them. The appointing authority actually conducted an investigation, by obtaining the MORs from the appellant, giving his version of the events of November 28, and questioning him about his relationship with Thomas. The appointing authority obtained information on which he could have proceeded with charges

against the appellant, but decided, instead, to credit contrary information from the appellant. The fact that the appointing authority made that decision did not mean that he did not have knowledge of misconduct sufficient to order an investigation; it meant that he decided not to make a finding of misconduct, despite that knowledge.

Moreover, the fact that the appointing authority did not have available, by January (30 days from the date of acquiring knowledge, whether that was on December 4 or, more conservatively, on December 20) the more definitive scientific proof of a gunshot residue test does not mean that he could not have determined the appellant's culpability and taken the appropriate disciplinary action. It just means that he did not have the best "smoking gun" evidence of culpability at that time. The *Geiger* Court rejected, as well, the argument that the appointing authority does not acquire knowledge of misconduct under SPP section 11–106(b) until the best evidence of misconduct can be obtained.

We note, in addition, that although the gunshot residue test results were not conveyed to the Division until April 10, 2002, the appointing authority knew in December 2001 that the test was going to be performed. Contrary to the ALJ's characterization, the gunshot residue test results were not surprising new evidence; they were the expected results of the BCPD investigation. At the hearing, the Department did not present any evidence as to why the test results were so long in coming, why there was a delay in providing them to the Division, or whether any steps were or could have been taken to have the test performed, and the results obtained, within 30 days of the December notice date.

The Department asserts that *Ford, supra,* 149 Md.App. 488, 817 A.2d 264, stands for the proposition that, notwithstanding the knowledge of misconduct the appointing authority had acquired, he could wait to obtain corroborating evidence of the appellant's alleged misconduct, without triggering the 30 day period under SPP section 11–106(b). We disagree. In *Ford,* sometime in January and February of 1999, an investigator

who was *not* an agent of the appointing authority acquired knowledge, from an inmate, that the employee, a correctional officer, was scheming to plant incriminating evidence on another employee. In March 1999, that same knowledge was acquired by another investigator, who *was* an agent of the appointing authority, in the form of an admission by the employee. The employee was terminated within 30 days thereafter.

We held that the knowledge of misconduct acquired by the first investigator could not be imputed to the appointing authority, because the first investigator was not the appointing authority's agent. *Id.* at 499, 817 A.2d 264. The termination was timely, under SPP section 11–106(b), because it was carried out within 30 days of when the second investigator, and hence the appointing authority, acquired knowledge of the misconduct for which the employee was terminated. We then commented that it was "noteworthy" that the first investigator's information was an uncorroborated accusation against a correctional officer, by an inmate, and that that investigator did not intend to terminate the employee on that information; and that the later admission by the employee corroborated the inmate's story. *Id.* We did not hold that, had the first investigator's knowledge been imputable to the appointing authority, the 30–day time period would have been held in abeyance until that corroborating evidence was obtained.

In the case at bar, the uncontroverted factual evidence established that the appellant's appointing authority acquired knowledge in December 2001 of the misconduct for which the appellant was terminated, with one exception. The exception is that the appointing authority did not obtain knowledge, until April 11, 2002, that the appellant's MOR of that date contained false statements, and that the appellant could not provide a true statement to explain the presence of gunshot residue on his left hand on November 28, 2001.

Disciplinary action taken based on misconduct by the appellant in November and December 2001 was not timely taken, pursuant to SPP section 11–106(b), and under the holding in

*Geiger* must be rescinded. Disciplinary action taken based on misconduct by the appellant in April 2002 was timely taken. In his merits decision, the ALJ did not clearly articulate the evidence in support of the appellant's violation of each of the Standards of Conduct and COMAR regulations. To the extent that the ALJ upheld the Department's termination of the appellant based on misconduct in November and December 2001—which would include his involvement in the shooting incident, his relationship with Thomas, his statements to the BCPD, his lack of cooperation in that entity's investigation, and his MOR statements of December 3 and 4—the termination must be rescinded.

The ALJ's factual findings about misconduct by the appellant in April 2002 are supported by substantial evidence in the record. Accordingly, we shall remand the matter to the ALJ for a determination of the specific violations by the appellant, based upon that misconduct, and the appropriate disciplinary action to be imposed.

## II. & III.

Our resolution of the first issue disposes of these issues.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY VACATED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE MATTER TO THE DEPARTMENT FOR FURTHER ADMINISTRATIVE PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**