973 A.2d 879

**EMPLOYEES' RETIREMENT SYSTEM OF BALTIMORE COUNTY, Maryland**

v.

**Garry A. BROWN.**

**No. 0954, Sept.Term, 2008.**

Court of Special Appeals of Maryland.

June 11, 2009.

Suzanne T. Berger (John E. Beverungen, County Atty., on the brief), Towson, for appellant.

John A. Austin of Towson, for appellee.

Panel: DAVIS, WOODWARD, and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

MOYLAN, J.

How sweeping is the commitment to render "honorable and faithful" service to one's profession? Will an unblemished record by day suffice, even if there are lapses into outlawry after dark? Should the retirement system for a profession surgically separate Dr. Jekyll from Mr. Hyde, so long as Mr. Hyde's criminality does not adversely affect Dr. Jekyll's performance as a medical practitioner? The retirement of the appellee, Officer Garry A. Brown, from the Baltimore County Police Department may provide an instructive case in point.

Brown served as an officer of the Baltimore County Police Department from 1986 to 2003. On February 2, 2004, he

entered a plea of not guilty on an agreed statement of facts in the District Court of Maryland for Baltimore County to a charge of possession of cocaine in violation of Maryland Code, Criminal Law Article, § 5–601. Pursuant to a plea agreement, Brown received a suspended sentence in favor of three years of supervised probation and 150 hours of community service. By way of further negotiation, he was permitted to resign from the Baltimore County Police Department rather than being officially terminated for cause by the Department.[1]

In November of 2003, Brown applied for a length of service retirement allowance. His three years of prior service in the military added to his seventeen years of service as a police officer made him eligible for a service retirement allowance. Brown's application was to the Employees' Retirement System of Baltimore County ("the Retirement System"), the appellant in this case. On March 9, 2004, the Retirement System denied Brown's application by a vote of 4–1. Brown appealed that decision to the Baltimore County Board of Appeals, which held a *de novo* hearing on October 21, 2004. Although the odyssey of this case through the adjudicative process has now included two trips to the County Board of Appeals, two trips to the Circuit Court for Baltimore County, and one prior trip to this Court, it was that first hearing before the Board of Appeals on October 21, 2004, that fully developed the factual picture over which all subsequent rounds of litigation have puzzled.

---

1. On appeal to the circuit court, the verdict against Brown was reduced to one of probation before judgment. At that hearing before Judge John Grason Turnbull, II, Brown used his loss of retirement benefits as a bargaining chip to persuade Judge Turnbull that he had already been punished enough. At a subsequent hearing before the Baltimore County Board of Appeals, he acknowledged that his attorney had made such an argument on his behalf:

Q  ... [O]n appeal of your criminal conviction, you went to the Circuit Court and told Judge Turnbull that you had lost your pension and you should be given leniency in the criminal case?

A Again, that's what my attorney stated.

Q  That was your position as given by your legal representative, is that correct?

A That's correct, what my attorney stated.

## A Double Life

Brown's habitual involvement with narcotics first came to light on October 16, 2003, when he submitted to a random urinalysis to test for the presence of controlled dangerous substances. Submitting to such tests is a routine requirement of employment with the Baltimore County Police Department. The test result on that occasion showed Brown to be positive for cocaine. As a consequence of that test result, Baltimore County police, on October 31, 2003, executed a search and seizure warrant on Brown's residence. They found 304 glass vials and 16 glass tubes, all with "white residue," as well as ziplock bags and pipes. Upon testing, several of the glass vials tested positive for cocaine. A permitted inference remained with respect to the other vials. Brown admitted to the investigating officers that he used cocaine.

When this case first came before this Court, Judge Kenney authored a 22–page unpublished opinion announcing our decision. *Employees' Retirement System of Baltimore County v. Brown,* 169 Md.App. 738, 742 (2006). That opinion well summarized the testimony of Brown himself before the Board of Appeals on October 21, 2004, as he sought to excuse his fall from grace.

> Brown testified before the Board that he began using cocaine after going through "a rough divorce" in 1990 or 1991. He acknowledged that he obtained the cocaine by purchasing it from drug dealers on the street, and that he had used cocaine with people who may have been aware that he was a police officer. He stated that his use was generally limited to weekends or other times when he was off duty for multiple days. At the time he tested positive, he was using cocaine approximately once or twice a month. He said that he never used cocaine while on duty, and never came to work while under the influence of narcotics. According to Brown, his cocaine use never interfered with his duties as a police officer.

The other two witnesses who testified before the Board of Appeals on October 21, 2004, were both members of the

Retirement System's Board of Trustees who had voted on Brown's application on March 9, 2004. Their testimony before the Board of Appeals did not add any new evidence to the factual data base but reflected, rather, opposing views about the significance of the unquestioned evidence. Sergeant Cole Weston was the president of the Fraternal Order of Police Lodge # 4 and a trustee of the Retirement System. As summarized by Judge Kenney, he explained his dissent from the vote of the Retirement System to deny Brown's application.

> *Sergeant Cole Weston,* who is a member of ERS and president of the union that represents Baltimore County police officers, testified that he had *voted to grant Brown's retirement allowance because there was no evidence that he had rendered poor service as an officer:* "Nothing indicated in his ratings poor performance. Nothing was indicated as far as excessive abuse of sick time, or not showing up to work on time . . . ." Sergeant Weston was of the opinion that "Mr. Brown, with his service time in the pension system, with the amount of credible service that he had already accrued through that time that he was there, in conjunction with his [prior] military time, . . . should have been able to go ahead and draw it."

(Emphasis supplied).

The final witness before the Board was Baltimore County Police Chief Terence Sheridan, who had been one of the four trustees voting to deny Brown's application. Judge Kenney summarized Chief Sheridan's testimony.

> Terence Sheridan, Chief of Police and also a member of ERS, testified that he had presented the facts of Brown's case to ERS and had moved for denial of Brown's application for retirement. *Chief Sheridan stated that his* motion and his *vote for denial were based on Brown's having* "us[ed] cocaine for almost half his career with the Baltimore County Police Department." He reasoned:

> > *Just the eight years of abuse of an illegal drug, the method in which he was acquiring the drugs,* the amount

of residue, the amount of drugs found in his house, the paraphernalia.

> *All those in combination,* to me, *meant he was not serving the citizens of Baltimore County faithfully and honorably.*

(Emphasis supplied).

### The First Decision of the Board of Appeals

Having had that evidence before it, the Board of Appeals delivered a 10–page written decision on December 16, 2004. It recognized at the outset that "the basic facts of this case are not in dispute." That is still the case. It posed the question before it as that of "whether or not the Applicant, Garry A. Brown, served his employer honorably and faithfully and therefor deserves a retirement benefit." The Board of Appeals reversed the decision of the Retirement System and ordered that Brown should receive the service retirement benefits. The Board of Appeals was especially troubled by the absence of any definitions or standards by which to judge the critical criterion of what exactly is "faithful and honorable" service.

> *The answer* to the question before us *is particularly troublesome because* we have two officials of the ERS Board of Trustees who have testified unequivocally that *no definitions or standards exist by which to determine what "faithful and honorable" service is.* Both Chief Sheridan and Sgt. Weston state that *the criteria applied is in the mind of each Board member.*

(Emphasis supplied).

The ultimate conclusion of the Board was that because of the absence of established and official definitions and guidelines as to what constitutes "honorable and faithful" service, the decision of the Retirement System was *ipso facto* "arbitrary and capricious."

> While taking illegal drugs is egregious and there are criminal penalties available in other venues, if we were to view retirement benefit cases in any other way, we would have to

know if the employee had ever had a speeding ticket for exceeding 65 mph (also a criminal act) or ever been involved in any other situation in his private life which might disqualify him as "faithful and honorable."

*The obvious and unsettling fact is that there seems to be no set determination or standard applied to "honorable and faithful service as an employee" by the ERS Board* in denying or approving retirement benefits as evidenced by the case history presented to this Board of Appeals. *There are no definitions, no guidelines, no rules, no regulations, and no procedures by which each case can be decided.* ... An unusual situation is decided, according to Chief Sheridan, by standards that "exist in each member's mind."

*To continue to make their determinations in the current manner* used by the ERS Board of Trustees, *decisions rendered are by definition arbitrary and capricious by the lack of any discernible standards or definition of terms.*
(Emphasis supplied).

## First Appeal to the Circuit Court

The Retirement System appealed that decision of the Board of Appeals to the Circuit Court for Baltimore County. In a Memorandum Opinion and Order of June 30, 2005, Judge Christian M. Kahl affirmed the decision of the Board to grant Brown his retirement benefits. The opinion of Judge Kahl was that there was "substantial evidence" to support the decision of the Board of Appeals and that its decision was, therefore, not legally defective.

## First Appeal to This Court

The Retirement System further appealed that decision of the Circuit court to this Court. The appeal to us was twofold, as the Retirement System urged upon us two reasons why the decision of the Board of Appeals should be reversed. We rejected the first of those reasons but were persuaded by the second. In the first of its contentions, the Retirement System challenged three very specific findings of the Board of Appeals as not being supported by "substantial evidence." They were

the Board's findings that 1) Brown had been "permitted" to retire, 2) that there was no evidence that Brown had used drugs while on duty as a police officer, and 3) that there was no evidence that "the use of drugs affected [Brown's] work performance in any way." We declined to reverse the Board of Appeals (and the Circuit court) on those evidentiary grounds. Our holding in that regard was, "We are not persuaded that the Board's findings [were] not supported by substantial evidence." That part of our decision, however, has no further pertinence to anything still before us.

We reversed the Board of Appeals (and the Circuit court) on an exclusively legal ground. That part of our opinion is now the law of this case. We held that the Board of Appeals had applied too narrow a standard of "honorable and faithful services as an employee" of the police department. Our bottom line was that a police officer's off-duty conduct, as well as his on-duty conduct, may be such as to render his services to the police department less than "honorable and faithful." Our holding was that the Board of Appeals was legally in error for having declined to consider the effect that Brown's off-duty behavior may have had on the issue of "honorable and faithful" service.

We referred first to the standard for a service retirement allowance set out by the Baltimore County Code:

The Baltimore County Code provides the criteria for the service retirement for which Brown applied:

A *member* who retires on or after July 1, 1995 *shall be entitled to receive a service retirement allowance* irrespective of age, consisting of an annuity and a pension which together will provide a minimum benefit of fifty (50) percent of average final compensation plus two (2) percent *for each year of creditable service* in excess of twenty (20), provided such member shall have a minimum of twenty (20) years of creditable service.

Baltimore County Code § 5–1–216(c) (2003). *Relevant to this case "creditable service" is defined as "prior service plus membership service,* for which credit is allowable as

provided in §§ 5–1–208 through 5–1–212 of this subtitle." Baltimore County Code § 5–1–201(i). *The Code defines "membership service" as "honorable and faithful service as an employee rendered while a member of the retirement system."* Baltimore County Code § 5–1–201(o).

(Emphasis supplied).

Judge Kenney's opinion pointed out that the Board of Appeals had, indeed, acknowledged that Brown's drug procurement and use might not in the abstract be deemed "honorable and faithful" but the Board then erroneously limited his "honorable and faithful" obligation to his on-duty hours.

*The Board stated that "the use of illegal drugs might automatically disqualify [Brown] as [having] perform[ed] honorably and faithfully."* Indeed, *the plain meaning of the phrase "honorable and faithful" would seem to exclude illegal activity by a police officer.* "Honorable" carries a number of connotations, including: "performed or accompanied with marks of honor or respect," "attesting to creditable conduct." "consistent with an untarnished reputation," "characterized by integrity: guided by a high sense of honor and duty." *Merriam–Webster's Collegiate Dictionary* 556 (10th ed.2000). The definition of "faithful" includes the following: "steadfast in affection or allegiance," "firm in adherence to promises or in observance of duty," and it implies unswerving adherence to a person or thing or to the "oath or promise by which a tie was contracted."

(Emphasis supplied).

We held that the Board of Appeals had focused too narrowly on the word "service" and thereby had erroneously concluded that an employee was obligated to be "honorable and faithful" only when literally engaged in on-duty "service."

In this case, Baltimore County Code § 5–1–201(o) refers to "honorable and faithful service *as an employee." The Board determined that the statutory language indicates that the inquiry should be limited to an employee's service in the performance of his or her professional duties:*

. . . .

*The Board concluded,* then, *that the phrase "honorable and faithful service as an employee" limited the inquiry to the employee's work performance while on duty.* "Service" is defined by the Baltimore County Code as "service as employee paid for by the employer."

(Emphasis supplied).

That narrow standard, we held, was the wrong standard, one that failed to comprehend the full nature of a police officer's obligation.

In our view, *in determining whether a police officer's conduct constitutes "honorable and faithful service as an employee," the inquiry is not limited to the officer's "working hours."*

(Emphasis supplied).

Our opinion expressly referred to the fact that "certain 'off duty' activities by police officers are regulated by the Baltimore County Police Department Administrative Manual." After quoting from several of the provisions directly bearing on Brown's admittedly unlawful conduct, we concluded that Brown's off-duty behavior had, indeed, been in violation of those provisions:

*The police manual also includes a drug policy: "Department members: 1. May not abuse any drug/substance, or possess any illegal drug/substance,* except in the lawful performance of duty. 2. Found to be in violation of the law or this policy will be disciplined." Both Sergeant Weston and Chief Sheridan testified to the applicability of the aforementioned regulations.

*Brown recognizes that his conduct was in violation of the police manual.*

(Emphasis supplied).

After quoting from Brown's testimony at the hearing before the Board of Appeals, in which he acknowledged that his repeated purchase of and subsequent use of contraband drugs was unlawful, our opinion was unambiguous in asserting that

Brown's "clear violation of his obligations as a police officer" most definitely "reflects on his 'service as an employee.'"

*We believe that Brown's clear violation of his obligations as a police officer, as set forth in the police manual, reflects on his "service as an employee."*

Police officers are unique among public servants. The Court of Appeals has noted that "[a] police officer holds a particularly sensitive position of public trust." *We have noted that most people accept as true that "police officers in America are 'considered to be on duty twenty-four hours a day; seven days a week.'"*

(Emphasis supplied). We subscribed to the notion of a police officer's "24–7" commitment to the law. In this regard, an officer's badge is never off.

Judge Kenney's opinion then reviewed several out-of-state legal decisions in which police officers had also been denied retirement benefits because they had been engaged in drug-related illegal activity even when off-duty. *DeSoto v. Hialeah Police Pension Fund Board of Trustees,* 870 So.2d 844, 846 (Fl.Dist.Ct.App.2003) (Officer argued that crimes "could not be related to his duties as a police officer" because they had been committed while he was suspended, but the court held to the contrary that such crimes "clearly violated his duty as a public officer to safeguard the public faith in his office."); *Siwek v. Ret. Bd. of Policemen's Annuity & Benefit Fund,* 324 Ill.App.3d 820, 258 Ill.Dec. 392, 756 N.E.2d 374, 381 (2001) (Even off-duty purchase of cocaine "related to his service as a narcotics specialist.").

We reversed the Board of Appeals (and necessarily the Circuit court) because it had failed to consider whether Brown's unlawful behavior even when off-duty might not render his service as a police officer less than "honorable and faithful."

In sum, *we hold that the Board interpreted section 5–1–201(o) too narrowly by limiting its inquiry to Brown's actual performance of his duties, without considering his violation of the police manual and the unique position of*

*police officers in society.* Accordingly, we vacate the circuit court's judgment, and instruct that court to remand the case to the Board for further consideration.

(Emphasis supplied).

Aggrieved by the decision of this Court, Brown petitioned the Court of Appeals for a writ of certiorari. The Court of Appeals denied cert.

### The Remand

■ Because Brown now contends that the Board of Appeals, upon its reconsideration of the case, exceeded the scope of what it had been directed to do on remand, it behooves us to make some comment with respect to our remand. It expressly ordered:

JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH INSTRUCTIONS TO REMAND TO THE BALTIMORE COUNTY BOARD OF APPEALS *FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.*

(Emphasis supplied).

That was, contrary to Brown's characterization of it, a broad remand. It expressly directed that the proceedings on remand would be "not inconsistent with," and would therefore necessarily consider, the full 22–page opinion of this Court. A fair reading of that opinion, moreover, could leave no conceivable doubt that its central thrust had been to state unequivocally the legal principle that a police officer's off-duty criminal behavior, as surely as his on-duty criminal behavior, could *ipso facto* support a finding that his service as a police officer had not been "honorable and faithful" and that retirement benefits could accordingly be denied. We did not, let it be carefully noted, say that such retirement benefits would automatically be denied. We said that, **as a matter of law,** they could be denied.

In our opinion, we made it plain on several occasions that Brown's behavior had been in clear violation of the law. We did not, however, state, **as a matter of fact,** that Brown's

service was less than "honorable and faithful" for the obvious reason that we are not fact finders. We did, however, clearly state, as what is now the law of the case, that the evidence in this case would support such a finding of fact if the Board of Appeals, on remanded reconsideration, should actually find that as an ultimate fact. Whether to make such a finding of fact was, of course, up to the fact finder, to wit, the Board of Appeals. We simply directed the Board of Appeals, as it embarked on its reconsideration, to take into account off-duty criminality as well as on-duty criminality.

What this Court held was that Brown's off-duty criminality **COULD,** as a matter of law, be enough to disqualify his application for retirement benefits. Whether in this particular case the off-duty criminality actually **DID** disqualify Brown's application was something that had to be decided by the Board, as a matter of fact. We repeat that we did not say that such a conclusion would necessarily or automatically follow. We most assuredly did not say that the facts in this case would compel such a conclusion. What we did say was that the facts in this case would, as a matter of law, **PERMIT** such a conclusion. It remained, however, for the Board of Appeals to weigh the gravity of Brown's conduct, as a matter of fact, and then reach its own independent conclusion in that regard.

We set no restrictions, moreover, on how the Board of Appeals should conduct its reconsideration hearing. We directed the Board to consider an additional criterion for assessing possibly disqualifying behavior, to wit, off-duty violations of the criminal law. To the extent to which the Board itself, or the advocates before it, then deemed it necessary to call additional witnesses or to take additional evidence bearing on either 1) the circumstances of his off-duty behavior or 2) the relative significance or insignificance of such behavior, we set no procedural boundaries. The Board was free to proceed in whatever manner it deemed appropriate.

### The Board of Appeals on Remand

On remand, the Board of Appeals took up its reconsideration of Brown's application at a hearing on June 5, 2007. At

the very outset of the hearing, counsel for Brown acknowledged that the conduct of the hearing was procedurally freewheeling, notwithstanding his current argument that it was rigidly controlled by our mandate.

*They* [the Court of Special Appeals] *don't tell us what the proceedings should be. They leave it up to the Board.* And, of course, we are in another unique position in that *none of the original members of the panel that decided this case are with us,* so *there will have to be a certain amount of starting over* with this particular panel.

And, again, that's how *I envision my presentation being, to supplement what has been presented previously,* which all the members of the panel are going to read and consider.

(Emphasis supplied).

The Board of Appeals had before it not only the opinion of the Court of Special Appeals but the transcript of the October 21, 2004, hearing before the Board and the December 16, 2004, written decision of the Board. In terms of taking additional testimony, it was Brown himself who requested the opportunity to present three witnesses with additional testimony.

*We believe that some additional testimony is appropriate* to give the Board a full picture of this, and that *in light of what has been presented previously by way of a full transcript* that was generated to a full day's hearing, that we are to make those additional presentations, listen in terms of argument and testimony, and then the Board will render its decision in light of both its original decision and in light of the additional materials and presentations that you have heard and that is the scope of the presentations, as I understand it.

(Emphasis supplied).

Brown called two witnesses who had been his co-workers at the Police Athletic League. They testified that he always performed competently on the job. The third witness was Brown himself. On cross-examination, he acknowledged fa-

miliarity with the Baltimore County Police Department Manual and the conduct it proscribed:

Q. We also discussed at the last Board meeting the fact that your conduct was in violation of the police department's administrative manual, is that correct?

A. The question was asked, was that in the manual? I said it was.

With respect to his recreational use of cocaine and to his sharing of those drugs with his social friends on a number of occasions, Brown could not deny that that sharing could qualify as distribution.

Q. Right. But *if you purchased drugs and gave them to somebody else, that's distributing them to somebody:*

A. *I guess you could interpret it that way.*

(Emphasis supplied).

Following the hearing, both parties were given the opportunity to submit memoranda of law. The Board filed its 8–page opinion on August 23, 2007, announcing and explaining its decision to deny Brown's request for a service retirement. The heart of the opinion was as follows:

It was quite apparent that *police officers are expected to conduct themselves with the utmost decorum and respect for their position as police officers* in the community, *both on and off-duty.* While Mr. Brown stated that he never reported for duty under the influence of drugs and that he was never disciplined for any actions as the result of his drug use, there is no question that he was under the influence of drugs when he was randomly tested by the Department according to its random drug testing procedures.

In addition, *Mr. Brown admitted that he purchased drugs on the street. This is a violation of the law and also a violation of his duty to apprehend and arrest drug traffickers or distributors. The fact that Mr. Brown purchased drugs and did not arrest the distributor or the person from*

*whom he purchased the drugs would be a violation of his duties as a police officer. In addition, Mr. Brown used drugs in a recreational manner with friends at his home and at parties where he admitted that the people at the party knew that he was a police office. This certainly reflected adversely on the Department.*

*The fact that 304 vials and 16 glass tubes and several zip lock bags and pipes were found in Mr. Brown's residence and that several of the glass tubes produced positive results for cocaine and crack cocaine indicates that there was considerable use of drugs by Mr. Brown during his employment with the Police Department.*

This Board recognizes that there was mention of the case of former police officer John Middendorf who left the Department under a cloud where he evidently was writing prescriptions for prescription drugs to which he became addicted as the result of his affliction with cancer. Middendorf was allowed to resign and receive a pension. This Board did not have all of the facts of the Middendorf case and does not feel that that case should be evaluated with respect to the situation regarding Mr. Brown, which is before this Board.

While the Board recognizes that there was no official reprimand given to Mr. Brown during his tenure as a Baltimore County Police Officer for his performance while on duty, *the panel cannot ignore his off-duty actions. Mr. Brown purchased illegal drugs from individuals known to be drug users and sellers. It was his obligation as a sworn police officer to arrest these types of individuals and he failed to do that.* In addition, *Mr. Brown's use of cocaine over a long period of time on a recreational basis with his friends, who knew he was a police officer, reflected adversely on the Department and was a violation of the Rules of Conduct set forth in Police Officer's Manual.* It also made Mr. Brown subject to possible blackmail by people familiar with his drug use.

Therefore, *this Board finds that Appellant Garry Brown failed to render honorable and faithful service to the Police Department of Baltimore County and his retirement benefits should be denied.*

(Emphasis supplied).

## The Second Appeal to the Circuit Court

Brown appealed that decision of the Board to the Circuit Court for Baltimore County. The Circuit court conducted a full hearing on June 4, 2008. On June 16, the Court filed an Order, reversing the decision of the Board of Appeals for "the reasons ... stated in the verbal opinion rendered from the bench" on June 4. Focusing particularly on the failure of the Board of Appeals to particularize precisely how Brown's off-duty criminal conduct "reflected adversely on the department," the Court concluded:

I find that the second board's conclusions of fact and attempt to apply the law was clearly erroneous.

## The Decision Being Reviewed

The Retirement System has now brought this case to us for the second time. Although this appeal is literally from the June 16, 2008 decision of the Circuit Court for Baltimore County, it is actually the August 23, 2007 decision of the County Board of Appeals that we will review. In *Pollard's Towing, Inc. v. Berman's Body Frame & Mechanical, Inc.*, 137 Md.App. 277, 287, 768 A.2d 131 (2001), we explained:

At the outset, *let it be clear whose decision is being reviewed and by whom.* The review on the ultimate merits is now being conducted by this Court. *We are not reviewing the procedural correctness of the earlier review by the circuit court. We are undertaking our own de novo review of the decision of the administrative agency ....*

The decision of the circuit court, therefore, is before us only in a *pro forma* capacity, as the necessary procedural conduit

by which the decision of the administrative agency gets to us for our review.

(Emphasis supplied).

Judge Deborah Eyler succinctly fixed the focus of administrative review in *McClellan v. Dept. of Public Safety and Correctional Services,* 166 Md.App. 1, 17, 887 A.2d 45 (2005):

> When reviewing a decision of an administrative agency, our role is "precisely the same as that of the circuit court." We review only the decision of the administrative agency itself.

As we had earlier noted in *People's Counsel v. Country Ridge,* 144 Md.App. 580, 591, 799 A.2d 425 (2002), we look not **AT** the circuit court decision but **THROUGH** it.

> Although the judicial act being appealed to us is literally the June 13, 2001 ruling of the Baltimore County Circuit Court, *our review will look not so much at the circuit court action as through it* to the December 13, 2000 decision of the Baltimore County Board of Appeals.

(Emphasis supplied).

In *Department of Health and Mental Hygiene v. Shrieves,* 100 Md.App. 283, 303–04, 641 A.2d 899 (1994), Judge Motz described the same sub-surface focus.

> Moreover, it is well recognized in Maryland that, *when reviewing administrative decisions, the role of an appellate court is precisely the same as that of the circuit court. See, e.g., Baltimore Lutheran High Sch. Ass'n, Inc. v. Employment Security Admin.,* 302 Md. 649, 662, 490 A.2d 701 (1985) ("A reviewing court, be it a circuit court or an appellate court, shall apply the substantial evidence test").

(Emphasis supplied).

### Appellate Mirror Images

That standard, at least because of the decisional history of this case, places this particular review in an interesting and somewhat aberrational posture. The normal tilt of the appellate playing field (it is never a level playing field, incidentally)

is reversed. It is, ironically, the appellant who has only to defend the decision being reviewed; it is the appellee who must attack it. The circuit court decision which is technically the thing before us on appeal is but a mirror in which we are actually looking at the decision of the Board of Appeals. In the rare case of an appellate tie, this reversal of perspective could make a critical difference; but, we hasten to point out, that is not the situation here. This standard of review for administrative decisions could, whenever the circuit court has reversed the administrative decision, also take on significance in terms of identifying the "prevailing party" as the reviewing court might be called upon to decide whose "most favorable version of the evidence" to accept. *McClellan v. Dept. of Public Safety and Correctional Services,* 166 Md.App. 1, 18, 887 A.2d 45 (2005). The seemingly simply question, "Who was the prevailing party below?" necessarily provokes in administrative appeals the further inquiry, "How far below?" The answer is, "At whatever level the decision was made that is now under review." That fascinating little wrinkle, however, has no bearing on this particular review.

### The "Substantial Evidence" Standard of Review

This Court reversed the earlier decision of the Board of Appeals because it had failed to weigh the evidence before it against an additional criterion, that of off-duty criminal behavior, which we held to be a necessary criterion to be considered. We remanded the case to the Board of Appeals so that it might then reweigh the evidence, with that additional criterion before it, and render its decision accordingly. It did so. The evidence that had been before the Board of Appeals in 2004 was, via both hearing transcript and written decision, again before it in 2007. The additional testimony of three witnesses in 2007 added nothing of significance. Weighing the evidence, of course, is the ultimate function of the fact-finding tribunal.

As a reviewing court determines whether an administrative tribunal was permitted, as a matter of law, to reach a given decision on the basis of what was before it, the test for the reviewing court to apply is the "substantial evidence" test.

In *Stover v. Prince George's County,* 132 Md.App. 373, 381, 752 A.2d 686 (2000), Judge Kenney both explained the substantial evidence test and pointed out that the application of that test calls for both appellate deference and appellate discipline.

> Rather, "[t]o the extent the issues on appeal turn on the correctness of an agency's findings of fact, *such findings must be reviewed under the substantial evidence test."* *Department of Health and Mental Hygiene v. Riverview Nursing Centre, Inc.,* 104 Md.App. 593, 602, 657 A.2d 372, *cert. denied,* 340 Md. 215, 665 A.2d 1058 (1995) (citation omitted). *The reviewing court's task is to determine "whether there was substantial evidence before the administrative agency on the record as a whole to support its conclusions." Maryland Commission on Human Relations v. Mayor and City Council of Baltimore,* 86 Md.App. 167, 173, 586 A.2d 37, *cert. denied,* 323 Md. 309, 593 A.2d 668 (1991). *The court cannot substitute its judgment for that of the agency, but instead must exercise a "restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions."*

(Emphasis supplied).

In *Eberle v. Baltimore County,* 103 Md.App. 160, 166, 652 A.2d 1175(1995), Judge Alpert had also stressed the extreme deference that a reviewing court, circuit or appellate, owes to the fact-finding of an administrative agency.

> This court recently reiterated the standard for appellate review of administrative agency decisions in *Hill v. Baltimore County,* 86 Md.App. 642, 659, 587 A.2d 1155, *cert. denied,* 323 Md. 185, 592 A.2d 178 (1991). When reviewing the factual findings of administrative agencies, it is the court's duty to determine whether the agency's decision was supported by substantial evidence. *Id.* In applying this "substantial evidence" standard, *the reviewing court must determine "whether a reasoning mind reasonably could have reached the factual conclusion that the agency reached." Id.* (quoting *St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert County,* 307 Md. 441,

447, 514 A.2d 1215 (1986)). *A court "must not engage in judicial fact-finding or substitute [its] judgment for that of the agency." Id.* (citing *St. Leonard Shores,* 307 Md. at 447, 514 A.2d 1215). Thus, we must examine the record to determine if there was substantial evidence from which a reasoning mind reasonably could have come to the factual conclusions reached by the Board of Appeals.

(Emphasis supplied).

In *Hill v. Baltimore County,* 86 Md.App. 642, 657, 587 A.2d 1155 (1991), Judge Rosalyn Bell had similarly observed:

When reviewing the decisions of an administrative agency, we must determine whether they are supported by substantial evidence. In this regard, our duty is to determine *" 'whether a reasoning mind reasonably could have reached the factual conclusion that the agency reached.' "* St. Leonard Shores Joint Venture v. Supervisor of Assessments of Calvert County, 307 Md. 441, 447, 514 A.2d 1215 (1986) (citations omitted). In applying this standard, we are mindful that we must not engage in judicial fact-finding or substitute our judgment for that of the agency. *St. Leonard Shores,* 307 Md. at 447, 514 A.2d 1215.

(Emphasis supplied).

■ As the Board of Appeals weighed the evidence, as a necessary part of its assessment of how grievous Brown's unquestionably criminal behavior actually was, its final decision was a judgment call. The issue was not whether Brown had abused cocaine. The issue was that of how serious a breach of his duty that abuse represented. In *Friends of the Ridge v. BG & E,* 120 Md.App. 444, 466, 707 A.2d 866 (1998), Judge Harrell clearly set out for this Court the mandatory dictates of the deference requirement.

If such substantial evidence exists, *even if we would not have reached the same conclusions as the Board* based on all of the evidence, *we must affirm.* Stated another way, *substantial evidence pushes the Board's decision into the unassailable realm of a judgment call, one for which we may not substitute our own exercise of discretion.*

(Emphasis supplied). We defer to judgment calls based on weighing just as surely as we defer to findings of first-level facts.

In *Eastern Outdoor Advertising v. Baltimore,* 128 Md.App. 494, 514, 739 A.2d 854 (1999), this Court also made it emphatically clear that our mandate to accept findings of fact based on substantial evidence applies as well to conclusions on mixed questions of law and fact.

> *When reviewing* findings of fact and *conclusions regarding mixed questions,* however, *the circuit court* "cannot substitute its judgment for that of the agency and *must accept the agency's conclusions if they are based on substantial evidence* and if reasoning minds could reach the same conclusion based on the record."

(Emphasis supplied). See also *Travers v. Baltimore Police Dept.,* 115 Md.App. 395, 420, 693 A.2d 378 (1997) (*"When a reviewing court examines the manner in which an agency applied law to facts,* which is a judgmental process involving a mixed question of law and fact, *great deference must be accorded to the agency."*) (Emphasis supplied).

With respect to such judgement calls, Judge Eldridge pointed out for the Court of Appeals in *Bulluck v. Pelham Wood Apts.,* 283 Md. 505, 513, 390 A.2d 1119 (1978):

> [D]ecisions of administrative agencies are prima facie correct and carry with them the presumption of validity.

*See also .Hoyt v. Police Commissioner,* 279 Md. 74, 88–89, 367 A.2d 924 (1977); *Dickinson–Tidewater, Inc. v. Supervisor,* 273 Md. 245, 256, 329 A.2d 18 (1974); *Heaps v. Cobb,* 185 Md. 372, 378, 45 A.2d 73 (1945). *And see Tochterman v. Baltimore County,* 163 Md.App. 385, 404–10, 880 A.2d 1118 (2005).

### Our Decision

■ We affirm, in effect, the August 23, 2007, decision of the Board of Appeals. We, therefore, necessarily reverse the June 16, 2008, decision of the Circuit Court for Baltimore County which reversed the Board of Appeals. The Board of Appeals maneuvered flawlessly in the slipstream of our opin-

ion. Its decision passed the substantial evidence test with evidence to spare. Indeed, our earlier opinion had strongly suggested (if it did not expressly state) that the evidence from the earlier hearing before the Board was substantial enough to support the ultimate decision if and when the appropriate tribunal should actually render such a decision.

## End Notes

### A. Semper Fidelis

Only a couple of loose ends merit further comment, even if by way of *dicta*. The on-duty versus off-duty dichotomy to which Brown doggedly clings does not hold water. *Beeler v. Behan*, 55 Md.App. 517, 464 A.2d 1091 (1983), was a case in which this Court affirmed the imposition of a disciplinary penalty against a Baltimore County police officer for violating the rules and regulations of the Baltimore County Police Department. In response to the officer's argument that the departmental rules did not apply to his off-duty conduct, our opinion clearly held:

> *Beeler argues that inasmuch as his remarks were made while off duty, he may not be disciplined. We do not agree. The regulations make no distinction between off duty and on duty misconduct by a police officer. See Matter of Schlear, Pa. Cmwith., 58 Pa.Cmwlth. 241, 427 A.2d 751 (1981), where the court held that off duty conduct clearly may be the basis of a charge of misconduct unbecoming an officer.*

55 Md.App. at 525, 464 A.2d 1091 (emphasis supplied).

In *Travers v. Baltimore Police Department*, 115 Md.App. 395, 693 A.2d 378 (1997), a Baltimore City police officer was terminated for assaulting his girlfriend while off duty. The termination of employment was based upon an administrative decision that the officer had violated the Departmental Rules and Regulations. In response to the officer's argument that the departmental rules did not apply to his off-duty behavior, Judge Harrell, citing *Beeler v. Behan*, wrote for this Court, *id.* at 422, 693 A.2d 378:

> *Appellant contends that there is nothing in the record that would indicate that the rules and regulations he allegedly violated apply to off-duty police officers.* This contention bespeaks appellant's failure to appreciate the applicability of the rules and regulations governing members of the Baltimore City Police Department....
>
> ....
>
> *... The regulations make no distinction between officer misconduct occurring either on or off-duty.* Instead, *the rules and regulations* contained within General Order 2–88 *were undoubtedly designed to apply to members of the Baltimore City Police Department regardless of whether they are on duty.*

(Emphasis supplied). In any event, we settled this issue as to the unquestioned pertinence of even off-duty behavior in our earlier opinion and it has been, since August 18, 2006, the law of the case.

## B. An *Ad Hoc* Factual Decision on a Case–By–Case Basis

Brown also protests that an occasional or hypertechnical violation of the criminal law should not lead to automatic disqualification for one's otherwise well-earned retirement benefits. An off-duty violation of the law does not, of course, automatically call for so heavy a sanction, and no one has ever said that it did. Neither the Board of Appeals nor this Court ever ruled that a single and technical violation of the criminal law by an off-duty officer automatically calls for the denial of that officer's retirement benefits. In terms of what criminal behavior, even off-duty criminal behavior, might be considered serious enough to render the officer's service less than "honorable and faithful," there is, of absolute necessity, an enormous range of discretion entrusted to the decision makers. By parity of reasoning, the discretionary weighing of the gravity of an offense is something that every sentencing judge must do as he decides between probation and ten years of imprisonment. That discretionary obligation is validly there even in the absence of a set of guidelines. So too is such discretionary weighing present in this case, even without further guidelines.

To be sure, a single act of unlawfully exceeding the speed limit or a discreetly executed act of adultery (with its maximum $10 fine) could not reasonably abrogate the accrued benefits of 20 years of faithful employment. That is not to say, however, that even a single act of murder or rape or armed robbery might not so qualify, even if the public never knew that the perpetrator was a police officer. The seriousness of the crime committed is one of the infinite variables. A crime calling for a ten dollar fine is obviously not the same as a crime calling for five years of imprisonment or for life imprisonment. A single criminal act might well not be given the same weight as a dozen such acts over a period of months or a hundred such acts over a period of years. Are victimless crimes given less weight than crimes with victims? Is there a distinction between crimes of vice, crimes of violence, crimes of greed, and crimes of falsity? Does the reason for the commission of a crime make a difference? Is the stealing of a loaf of bread by Jean Valjean no different than the deliberate flouting of the law for casual amusement? All of this is obviously a part of the totality of the circumstances that must be weighed on an *ad hoc* basis. There are infinite variables and there is no way to reduce them to a predictable and easily administered matrix.

## C.  The Off–Duty Crimes In This Case

The crimes in Brown's case were no mere peccadillos. They were heavy duty stuff. For the crimes of possession, we are not even talking about marijuana with possible imprisonment for each act of possession of one year, Criminal Law Article, § 5–601(c)(2), but about cocaine with possible imprisonment for each act of possession of four years plus a possible fine of $25,000. § 5–601(c)(1). If Brown furnished cocaine to his friends, moreover, his crime may have escalated up to the level of distribution, §§ 5–602 and 5–608(a), a felony with possible imprisonment for 20 years.

We are also not talking about a single violation. We are talking about a pattern of chronic and repeated conduct as frequent as twice a month (or 24 times a year) over the course

of no less than seven or eight years. This was no isolated lapse of judgment under extreme emotional circumstances. Nor are we talking about an addictive use of drugs in private. Brown adamantly insisted that he could stop at any time he wished, and he did seem to pick the timing of his lapses carefully.

## D.   When Must a Crime Cast Its Adverse Reflection?

Before the circuit court Brown added the wrinkle to his argument that there was no evidence that his criminal behavior "reflected adversely on the police department." He argues that no one knew he was using drugs regularly except his close friends and that his friends did not care. He takes, however, too narrow a view of the phrase "reflected adversely." Brown used cocaine regularly in company with a group of social friends who knew he was a police officer. In the eyes of those social friends, the reputation of the Baltimore County Police Department was arguably discredited, even if those social friends violated the law themselves and even if they applauded such violations. The Department, in terms of its integrity and its efficiency, can be discredited in the eyes of its enemies, as well as in the eyes of its friends. Brown gave those social friends good reason to disdain the Department he served. The quality of his service does not fluctuate with whether they actually felt such disdain or not.

The further suggestion is made that as long as Brown's identity as an officer remained hidden (except to his social friends), his criminal conduct would not reflect adversely on the Baltimore County Police Department. We strongly disagree. With respect to the use by the Police Department Manual of the phrase "which would reflect adversely upon the Department," we conclude that implicit within that concept is the necessary qualifier "if known to others." If that were not so, it would suggest that even an ongoing series of murders or of bank robberies or of cat burglaries might fail to qualify as less than "honorable and faithful" service as long as no one knew that the perpetrator was a police officer. By that logic, even on-duty criminality arguably might not reflect discredit if nobody knew about it. Did Benedict Arnold's intended be-

trayal of West Point to the British, for instance, not reflect discredit on the Continental Army simply because no one knew of his treason at the time of the initial plotting?

In any event, the identity of Brown as a police officer, coupled with his status as a violator of the narcotics laws, did, indeed, become public knowledge with his arrest and trial in District Court on February 2, 2004. Certainly as of that point in time, his criminal behavior reflected adversely on the Baltimore County Police Department. That adverse reflection, moreover, had occurred as of the time that his retirement benefits were denied. We are aware of no statute of limitations on the phrase "reflected adversely" and there is no reason the adverse reflection could not come afterward as well as contemporaneously.

## E. Resort to Narcotics Is Not Recreational Sport

We cannot help but take final note of how Brown treats his "recreational" use of cocaine with an almost casual insouciance. The attitude seems to be that although the possession of narcotics may be a crime for those who cannot handle it, it should not be treated as a crime for those who can handle it. We cannot share that selective nonchalance. The narcotics problem is a national scourge. The vendee as well as the vendor is an integral and indispensable part of the illicit traffic. Every time that Brown traveled to East Baltimore, even without revealing his true occupational identity, to meet with his seller or pusher, he nurtured and contributed to the perpetuation of a social epidemic. He was, moreover, someone who should at the time have been doing everything in his power to root out this devastating scourge and not be one promoting it as one of its steady and reliable customers.

### Conclusion

We affirm the decision of the Board of Appeals and thereby reverse the decision of the Circuit Court for Baltimore County.[2]

---

**2.** If we have not heretofore addressed the so-called "Middendorf case," it is because we deem the excessive discussion of it to have been so

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY REVERSED; COSTS TO BE PAID BY APPELLEE.**

much irrelevant chatter. It was another decision of the Retirement System made with respect to another applicant on another occasion. Without retrying that entire case as a part of this case, there was no way of knowing how similar or dissimilar that case was to this. There was no way of knowing whether that case was rightly or wrongly decided. Those things do not matter, however, because some particular decision by an administrative agency, rightly or wrongly decided, does not become authoritative precedent for all other decisions that may follow. In pursuing the "Middendorf" comparison, all parties were obsessively running down a tangent that leads nowhere.