Circuit Court for Anne Arundel County
Case No. C-02-CV-15-000104

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2413

September Term, 2015

_____

LAUREL RACING ASSOCIATION, L.P.

v.

ANNE ARUNDEL COUNTY, MARYLAND

_____

Meredith,
Nazarian,
Moylan, Charles E., Jr.
      (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed: July 25, 2017

* Judge Andrea M. Leahy did not participate, pursuant to Md. Rule 8-605.1, in the Court's decision to report this opinion.

Back in the last decade, Laurel Racing Association ("Laurel Racing") began planning to redevelop the Laurel Park horse racing complex. As part of that process, Laurel Racing reserved from Anne Arundel County (the "County") the additional water and sewer capacity its new facilities would require. After reviewing the proposed plans, the County's Office of Planning and Zoning ("OPZ") approved, in 2008, the allocation Laurel Racing requested, and Laurel Racing never appealed that decision.

Reserving water and sewer capacity isn't free, and when a substantial fee came due in 2013, Laurel Racing challenged the Department of Public Works's ("DPW") method of calculating the capacity the project needed, arguing that the long-ago-approved figure had overstated its incremental water and sewer needs by failing to credit the racetrack's current usage. The parties exchanged data and studies, and DPW sent Laurel Racing a letter on February 25, 2014 offering to reduce the allocation. The question for us is whether this letter was an appealable agency action. It wasn't.

## I.  BACKGROUND

In 2006, Laurel Racing submitted to OPZ a Development Application that proposed a wholesale renovation of the racing complex. The application included a sketch plan that included demolition of the existing grandstand and renovations to the site that would reduce the seating capacity for horse racing (which had become less popular) in favor of commercial and retail space and space for the long-awaited arrival of "video lottery terminals." The sketch plan also included a required water and sewer capacity calculation worksheet that concluded that the project would require 1,501 equivalent dwelling units ("EDU") of new water and sewer capacity. The EDU worksheet outlined future uses only

because "[a]t the time of submission, the project engineer was unaware of any County policy or procedure where a developer could seek to offset proposed EDU usage with existing usage."

The Anne Arundel County Code (the "AACC" or the "Code") provides that "[f]or a property that is required to pass the test for adequate public water supply facilities or adequate public sewerage facilities, [DPW] shall make an allocation on the date of approval by [OPZ] for adequacy of public water supply facilities as provided in § 17-5-202 of this Code." AACC §13-5-402(b) (2005). An allocation, a "reservation, for use by a particular property, of available capacity," AACC § 13-5-401, is required if, "due to development activity on the property, the property is required under Article 17 of th[e Code] to pass the test for adequate public water supply facilities or adequate public sewerage facilities; or the property is otherwise connecting to the County water or wastewater system," AACC § 13-5-402(a). DPW does not analyze on its own whether a subdivision proposal adds to or displaces existing water and sewer facilities—it relies on the developer's engineer to determine the project's impact. In two letters dated November 21, 2008, OPZ approved Laurel Racing's sketch plan and allocated 1,501 EDUs of water and sewer for the project. Laurel Racing did not appeal this decision.

Water and sewer capacity are finite resources, and the Code imposes charges on developers to reserve EDUs for future development. "For property receiving an allocation in conjunction with approval by [OPZ] for adequacy of public water supply facilities . . . , the owner of the property shall pay, for each equivalent dwelling unit: (1) an allocation reservation charge . . . as computed by [DPW] . . . ; and (2) [a] capital facility connection

2

charge . . . ." AACC § 13-5-403(a). Allocation reservation charges were due immediately, and Laurel Racing paid them. The capital facility connection charge ("CFCC") and deferral fees did not come due until the fifth anniversary of the allocation, and on November 1, 2013, DPW sent Laurel Racing Allocation Billing Statements due on November 30—one for water EDUs totaling $19,974,600 and one for sewer EDUs totaling $4,328,640.

Sometime in 2013, though, Laurel Racing had learned that the County had, as the County's Board of Appeals later put it in a Memorandum Opinion we discuss below, a "policy or procedure in effect at the time of the 2006 submission to provide EDU credits for existing facilities. That is, if a use had existing EDUs, the County requires that a developer reserve only the number of <u>additional</u> EDUs that would be required to serve the redevelopment." (Emphasis in original.) The then-DPW Director explained to the Board that these credits were meant to ensure "that an owner doesn't pay the [facility connection charge] for EDUs that they've paid to the County in the past," and that DPW was responsible for calculating the new EDUs required. Accordingly, Laurel Racing "contacted the County about the concern that [it] w[as] being—flows were being double counted, and they were not being adequately considered for what existing flows [it] already had in the system, what existing capacity [it] had in the system."

On December 12, 2013, Laurel Racing's representatives met with DPW to discuss the possible double-counting. Rather than requiring a new EDU worksheet, the County asked "if [Laurel Racing's] consultant could come up with a way to analytically compare the existing use, dis-aggregate . . . what's in the grandstand [a mix of retail and commercial

3

space], to an existing use number so that [DPW could] compare it to what's proposed."

DPW followed up on the meeting in a letter dated December 23, 2013:

> As discussed during the meeting, [DPW] has agreed to give your engineers through January 31, 2014, to provide information regarding existing uses that may have been part of the EDU calculation previously provided. [DPW] will thereafter review the information and make a revised EDU calculation, if appropriate.
>
> If the number of EDUs is revised, the original allocation date will still apply and all associated charges will be due in accordance [with] the County Code based on the original allocation date of November 21, 2008. Therefore, the [CFCCs] and the capital facility deferral fee for the adjusted number of EDUs will be due no later than April 30, 2014, or the allocation will lapse. . . .
>
> The County will stay the late interest on the outstanding [CFCCs] until February 28, 2014. This time was determined to be roughly 30 days for the new information to be provided to DPW and 30 days for review and final agreement.

DPW explained that "[a]s th[e double counting issue] came to [its] attention after 2008, . . . [DPW offered credits because it] was trying to reach a reasonable settlement of what the existing capacity in the system associated with Laurel [Racing] was."

On January 29, 2014, Laurel Racing's engineer sent a letter to DPW detailing its calculations: "the total existing flow equals 306,100 gallons, or 1,224 EDU's" and the total proposed flow in accordance with this calculation is 261,030 gallons per day or 1,044 EDU's." As such, the engineer concluded that Laurel Racing's water flow would not increase as a result of the redevelopment:

> [W]e suggest that the Laurel [Racing] proposed plan, in fact, will not generate an increase in flow, and therefore not require additional EDU's to be allocated and thereafter purchased.

4

> Had the existing uses been accounted for in the original computation from 2007, we believe this would have come to light, thereby avoiding the need to purchase additional capacity, paying the allocation reservation charges, and saving the owner significant expense.

In the engineer's view, the numbers "basically show[ed] that there already is more capacity vested than what [Laurel Racing] need[s]."

DPW and OPZ staff reviewed the analysis and found "a lot of inconsistencies with how the comparison was done." According to DPW staff, Laurel Racing's EDU number resulted "[f]rom a new proposed scheme development configuration that [it] couldn't corroborate." So DPW responded, in a letter from its Director dated February 25, 2014, that the EDU calculations in Laurel Racing's original application and the 2008 allocation of 1,501 EDUs did not account for Laurel Racing's *current* water and sewer usage. The Director acknowledged receipt of Laurel Racing's engineer's January 29, 2014 letter, but expressed concern with the calculation of current usage, and concluded that the redevelopment would *increase* capacity needs by 470 EDUs for water and 954 EDUs for sewer.[1] The letter noted that although Laurel Racing may have modified the project, "the recalculated EDUs discussed in this letter can only be based on the proposal that has been approved by [OPZ]. If the project is to be revised again, the proposal would be considered

---

[1] In calculating these numbers, the Director used "the proposed EDUs [of] 1,501 because . . . that's what matched the sketched plan submittal that [DPW] had received at the time" and the highest actual peaked usage numbers because "it's more representative that [Laurel Racing] could have a peak use time . . . . It is high, but I thought it was representative of their usage in the system." Between 2009 and 2013, the highest water systems reading was 1,031 EDUs and the highest sewer system reading was 547 EDU. The incremental EDUs needed for the new project should equal the proposed 1,501 EDUs minus the highest actual usage.

5

by [OPZ] during the course of the normal review process." The Director concluded that OPZ would issue a revised allocation letter and that the revised capital facility connection and deferral fees would need to be paid by no later than May 5, 2014 to prevent the allocation from lapsing.

Laurel Racing received a revised Allocation Billing Statement on March 5, 2014 that reduced the total fees to $12,674,800. The new statement said that interest would be added to payments received after April 20, 2014, and that if the bill remained unpaid after May 5, 2014, the new allocation of 954 units of sewer and 470 units of water would lapse. Around this same time, Laurel Racing filed a Notice of Appeal with the Anne Arundel County Board of Appeals (the "Board") challenging DPW's calculation of the EDUs required for the project and the resulting charges and fees.

Then, in response to OPZ's concern that its engineers had submitted the proposed EDU worksheets with its sketch plan "and did not consider any flows/capacity of the existing development at the site," Laurel Racing sent a letter to OPZ on April 17, 2014 that contained new EDU computations by different engineers. The new calculations included both existing and proposed water and sewer usage, and determined that "the total existing flow equated to . . . 1,225 EDU's" and "the total proposed flow equates to . . . 1,044 EDU's." (Emphasis omitted.) Laurel Racing's engineers also asked OPZ and DPW to "re-evaluate the EDU worksheets for this project and issue a new revised corrected allocation letter" because, they argued, "[b]ased on [their] analysis . . . the proposed Laurel Park project will not generate an increase in flow, and therefore should not have required additional EDU's to be allocated and subsequently purchased/reserved. Had the existing

6

uses and flows been accounted for in the original Sketch Plan and Allocation approvals in 2007, the track owners would have avoided the need to purchase additional capacity and pay for the reservation charges, saving the track a considerable unnecessary expense."

The County responded by letter on May 2. The letter acknowledged that OPZ "ha[d] reviewed the revised EDU worksheet, but a revised allocation based on that c[ould] not be issued without a formal Final Plan being resubmitted." It did, however, review archived records of Laurel Racing's actual usage back to 2001 that showed peak daily usage of 1,162 EDUs for water and 674 EDUs for sewer. As such, the County "offer[ed] to revise the allocation set forth in the February 25, 2014 letter to 339 EDU's for water (1501 minus 1162) and 827 EDU's for sewer (1501 minus 674) based on the archived billing records." The letter cautioned as well that "[t]his letter does not constitute a final, appealable decision; it is an offer to revise the EDU calculations."

The County then moved in July 2014 to dismiss Laurel Racing's appeal on the grounds that the appeal of the February 25 letter was untimely and that the Board lacked jurisdiction. After "meet[ing] in closed session to consult with counsel to obtain legal advice," the Board denied the motion, concluding that the February 25 letter constituted a modification of a prior approval. In August 2014, the County submitted a Motion to Reconsider its Motion to Dismiss and the Board denied that motion too.

After seven evenings of hearings, the Board issued its decision in a Memorandum of Opinion on December 15, 2014. The Board found that the February 25 "letter represent[ed] an approval (albeit not in the full amount) of [Laurel Racing]'s request for EDU credits and contain[ed] an 'operative event' from which a proper appeal may be noted

7

to this Board," (citing *United Parcel Serv., Inc. v. People's Counsel for Balt. Cty., Md.*, 336 Md. 569, 583–84 (1994)), and thus that the appeal was timely. On the merits, the Board granted Laurel Racing (1) a credit for 1,501 EDUs improperly reserved, (2) a credit of $2,592,839.15 for improperly assessed Allocation Reservation Charges to be applied towards future usage and facility charges at the Laurel Park location, (3) a waiver of all pending Allocation Reservation Charges, (4) a credit for existing capacity of 1,225 EDUs, and (5) a determination that the Laurel Park redevelopment will require only 1,044 EDUs.

The County sought judicial review in the circuit court and Laurel Racing cross-appealed. The parties submitted memoranda and the court held a hearing on May 11, 2015. In an Order and Memorandum Opinion entered on January 8, 2016, the circuit court reversed and remanded to the Board with directions to grant the County's Motion to Dismiss. The circuit court addressed *sua sponte* the need for a final administrative order before a party may resort to judicial review, and determined that the February 25 letter was not a final administrative decision:

> [The February 25 letter wa]s at most a statement of intention that the County will modify and recalculate the EDUs, but only after pending actions such as, a "Final Plan" was submitted, payments were made by Laurel Racing and an agreement was executed between the parties. The Director of DPW in his February 25, 2014, letter did not grant, deny, decide or approve anything. The required plan had not yet been submitted. The Director's letter simply explained the County's intention to review and recalculate EDUs per the request of Laurel Racing.

Laurel Racing filed a timely notice of appeal.

8

## II. DISCUSSION

Laurel Racing raises the single issue of whether DPW's February 25, 2014 letter constituted an appealable decision.[2] It argues that the February 25 letter was a final approval and modification that left nothing further for OPZ to do beyond a "merely ministerial" task, and that even if the February 25 letter was not final, it was still appealable as an "interlocutory administrative decision ha[ving] immediate legal consequences causing irreparable harm." (quoting *Dorsey v. Bethel A.M.E. Church*, 375 Md. 59, 75 (2003)). Ultimately, though, there is no getting around the fact that the February 25 letter was not a final administrative decision.

When reviewing appeals from circuit court orders reviewing administrative agency actions, we review the decision of the agency, not the circuit court:

> When we review the decision of an administrative agency or tribunal, "we [assume] the same posture as the circuit court . . . and limit our review to the agency's decision." *Anderson v. Gen. Cas. Ins. Co.*, 402 Md. 236, 244 [] (2007) (internal citation omitted). The circuit court's decision acts as a lens for review of the agency's decision, or in other words, "we look not *at* the circuit court decision but *through* it." *Emps. Ret. Sys. of Balt. Cnty. v. Brown*, 186 Md. App. 293, 310 [] (2009) [] (emphasis in original) (internal citations omitted).

---

[2] Laurel Racing phrased its sole Question Presented as follows:

> Did the Circuit Court err in holding that a County decision revising Laurel Racing's water and sewer allotment, and assessing almost $12 million in fees on Laurel Racing to be paid on a date certain, was not final or otherwise appealable—even though the County attempted to collect the fees by selling Laurel Racing's property at a tax sale, and the Circuit Court itself enjoined that sale so that Laurel Racing could appeal the decision?

9

We "review the agency's decision in the light most favorable to the agency" because it is "prima facie correct" and entitled to a "presumption of validity." *Anderson v. Dep't of Pub. Safety & Corr. Servs.*, 330 Md. 187, 213 [] (1993) (internal citation omitted).

The overarching goal of judicial review of agency decisions is to determine whether the agency's decision was made "in accordance with the law or whether it is arbitrary, illegal, and capricious." *Long Green Valley Ass'n v. Prigel Family Creamery*, 206 Md. App. 264, 274 [] (2012) (internal citation omitted). With regard to the agency's factual findings, we do not disturb the agency's decision if those findings are supported by substantial evidence. *See id.* (internal citations omitted). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Catonsville Nursing Home, Inc. v. Loveman*, 349 Md. 560, 569 [] (1998) (internal citations omitted) (internal quotation marks omitted). We are not bound, however, to affirm those agency decisions based upon errors of law and may reverse administrative decisions containing such errors. *Id.*

*Sugarloaf Citizens Ass'n v. Frederick Cty. Bd. of Appeals*, 227 Md. App. 536, 546 (2016).

At the outset, we need to identify the final agency action before us. *Holiday Spas v. Montgomery Cty. Human Relations Comm'n*, 315 Md. 390, 395–96 (1989) ("As a general rule, an action for judicial review of an administrative order will lie only if the administrative order is final." (citing *Md. Comm'n on Human Relations v. BG&E Co.*, 296 Md. 46 (1983))); *see also Dorsey*, 375 Md. at 74–75 (citing cases regarding judicial review of a final administrative decision). "Generally, to be final, an administrative order must also 'leave nothing further for the agency to do.'" *Holiday Spas*, 315 Md. at 396 (quoting *BG&E Co.*, 296 Md. at 56). The Board found that the February 25 letter from DPW to Laurel Racing qualified as an appealable decision of approval and that the resulting appeal

was timely. The circuit court disagreed, and Laurel Racing argues *first* that the court erred by failing to recognize DPW's February 25 letter as an "approval" and "modification" of OPZ's original allocation.

With all of the focus on the more recent administrative process, it can be easy to lose sight of the project's history. The starting point isn't the current dispute, but rather is the existing allocation, which was approved when OPZ approved Laurel Racing's sketch plan in 2008. Importantly, OPZ, not DPW, is the deciding agency: "[f]or a property that is required to pass the test for adequate public water supply facilities or adequate public sewerage facilities, *[DPW] shall make an allocation on the date of approval by [OPZ]* for adequacy of public facilities as provided in § 17-5-202 of this Code." AACC § 13-5-402(b) (emphasis added). Although the DPW Director determines a property's EDU calculation, that calculation is not official until *OPZ* sends a letter approving the property's "initial application for approval of a sketch plan or preliminary plan, or during review of the application for final plan or site development plan approval." AACC §17-5-202(a); *see also* AACC § 13-5-804(a) ("[W]henever a charge is set based on [EDUs], the property owner shall provide all information required by the Director [of DPW] and the Director shall reasonably determine, based on that information and any other information that the Director deems appropriate, the number of [EDUs] for a property based on peak daily usage."); § 17-5-202(b) ("Approval for adequacy of public facilities . . . occurs on the date of a letter from [OPZ] approving a sketch plan."). Put another way, the ultimate decision is embodied in OPZ's approval of the sketch plan.

11

Laurel Racing did not appeal any element of the approved sketch plan. The *status quo*, then, is that five years after approval, November 1, 2013, Laurel Racing owed the balance of the deferred allocation fee, *i.e.*, $24,303,240, if it wished to maintain the allocation. Since that allocation became final long ago, Laurel Racing needs to effect a *post hoc* modification of that long-since-final decision in order to reduce the amount it owes or otherwise to maintain the allocation without making the full payment. The question for us is whether anything that has happened to date modified the *status quo*.

And to this point, there is no superseding decision from DPW. Laurel Racing argues *first*, though, that the February 25 letter constituted an "approval" and "modification" of OPZ's original allocation. That letter stated the number of EDUs that "the project should have been allocated," that "[a]t this point, however, the recalculated EDUs discussed in this letter can only be based on the proposal that has been approved by [OPZ]," and that "[OPZ] *will issue* a revised allocation letter setting forth the change in EDU calculations as described in this letter." (Emphasis added.) But putting aside the fact that the letter merely states an intention to act, only OPZ, the body that approved the development in the first instance, can modify its earlier decision. DPW's revised allocation numbers might well ripen into the new allocation once OPZ approves a new final sketch plan. But that hasn't happened, and DPW's calculation is not embodied in an appealable agency decision until OPZ approves the final sketch plan.

The process here is distinguishable from a confirmatory statement, like the one in *United Parcel Service, Inc.*, 336 Md. at 584, or a reconsideration, like that in *National Institutes of Health Federal Credit Union v. Hawk*, 47 Md. App. 189, 196 (1980). In *United*

12

*Parcel Service, Inc.*, the Court of Appeals held that a confirmatory statement regarding a license or permit that was issued in the past was not an appealable event, and that the appealable event is "the issuance, renewal, revocation, etc. of the license or permit." 336 Md. at 584. Similarly, in *Hawk*, we held that "an administrative decision concerning reconsideration of zoning is not an appealable final order." 47 Md. App. at 196. In *Montgomery County v. Longo*, in which a decision "based on new factual information presented and submission of a revised building permit application" was "not merely a reaffirmation of the prior issuance of a building permit," and thus was appealable. 187 Md. App. 25, 54–55 (2009). But again, there's a step missing here: the actual decision by OPZ to modify Laurel Racing's sketch plan with a new EDU allocation.

And that step awaits submission by Laurel Racing of a revised sketch plan. *See* AACC § 17-3-303 (stating the need for an applicant to submit a new application for sketch plan approval after receiving a report from OPZ providing the "findings, comments, and recommendations of the County through its reviewing agencies"). According to the Board, a final sketch plan had not been approved as of December 2014, and Laurel Racing's most recent submission was made in May 2014. The February 25 letter from DPW is not an administrative action that "leave[s] nothing further for the agency to do." *Dorsey*, 375 Md. at 75 (quoting *BG&E Co.*, 296 Md. at 56). By its own terms, the letter details additional steps required by the AACC, and we agree with the circuit court's conclusion that there was no appealable agency action.[3]

---

[3] For that reason, we need not consider the timeliness of Laurel Racing's appeal, which is governed by Rule 2-101(a) in Appendix B of the Code ("All appeals from orders or

Laurel Racing argues *next* that even if we determine that the February 25 letter was not final, as we have, it was appealable under an exception to the finality requirement in which "parties need not 'await a final administrative decision before resorting to the courts' if the 'interlocutory administrative decision has immediate legal consequences causing irreparable harm.'" (quoting *Dorsey*, 375 Md. at 75). We see no such irreparable harm here.

It's true that an order may be deemed final if it inflicts "sufficient irreparable injury" by affecting a party's business in ways that could not be remedied at a later date. *Holiday Spas*, 315 Md. at 399. Laurel Racing conflates its efforts to reduce its EDU obligation with circumstances that led the Laurel Park property to be advertised for a tax sale,[4] but even if money owed in error qualified as irreparable harm, these developments are only indirectly related. The tax sale proceeding flowed from Laurel Racing's failure to pay the deferred

---

decisions from which an appeal is authorized by law shall be taken within 30 days of the date of such order or decision, except where a different period is proscribed by law or rule, by the filing of a notice of appeal with the County Board of Appeals."). Whether or not the appeal was timely, the Board should have granted the County's Motion to Dismiss because the letter appealed here was not a final appealable decision.

[4] *See* AACC § 1-9-101 ("When an owner of property is responsible to the County for the payment of money, the amount shall be levied, collected, and enforced in the same manner as County real property taxes and have the same priority rights, bear the same interest and penalties, constitute a lien on the real property so assessed, and be treated the same as County real property taxes."). The County initiated the process of selling the property at a tax sale while the Board was conducting hearings. Laurel Racing brought an emergency action in the circuit court for a temporary restraining order ("TRO") to stop the tax sale. At the TRO hearing, the circuit court dismissed all defendants except the County, granted Laurel Racing's TRO, and stayed the tax sale because it found that "immediate and irrepairable [sic] harm will occur." This immediate and irreparable harm, however, is separate from the calculation of EDUs at issue in this appeal.

allocation fees due on anniversary of the allocation. The amount due had been determined in 2008 and was never appealed, and Laurel Racing didn't attempt to reduce the EDU allocation until after the fees came due. Had Laurel Racing paid the amount due, it would have received a credit for any amount it paid above any revised amount. And as we have already determined, Laurel Racing has not established, in the administrative arena or here, any right to relief from the original allocation fees.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. APPELLANT TO PAY COSTS.**